**GREEN SAVITS & LENZO, LLC**
35 Airport Road, Suite 200
Morristown, NJ 07960
(973) 695-7777
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAIME WILLS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RADIOSHACK CORPORATION,<br><br>Defendant. | Civil Action No.<br>1:13-cv-02733 (PAE) (HBP)<br>ECF CASE<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, Jaime Wills, by and through counsel, on behalf of himself and all others similarly situated, upon personal knowledge as to himself and upon information and belief as to other matters, against Defendant RadioShack Corporation ("RadioShack"), states and alleges the following:

## INTRODUCTION

1.      This is a class action pursuant to Fed. R. Civ. P. 23 to remedy violations of New York Labor Law Articles 6 and 19 on behalf of a class of New York employees.

2.      The named Plaintiff and other similarly-situated employees were employed by Defendant as non-exempt, salaried, store managers.  Defendant failed to pay Plaintiff and other similarly-situated store managers overtime compensation at the rate of one and one-half times their regular rate of pay for the hours they work over 40 in a workweek, and instead paid them

one-half times their regular rate based on the U.S. Department of Labor's Fluctuating Workweek ("FWW") method of payment. Defendant, however, unlawfully used the FWW method of payment by paying them quarterly and year-end bonuses in addition to their salary. By unlawfully using the FWW method of payment, Defendant violated New York Labor Law Articles 6 and 19 inasmuch as Defendant failed to pay named Plaintiff and other members of the class at the prescribed rate of one and one-half times their regular wage rate of pay for all overtime hours worked.

## JURISDICTION AND VENUE

3.     The Court has original jurisdiction pursuant 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act, in that: 1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; 2) this action is a class action in which one or members of a class of Plaintiffs is a citizen of a state different from the Defendant; and 3) the Defendant is a not a state, state official, or other governmental entity, and the number of members of the proposed class is greater than 100.

4.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business and is subject to the Court's personal jurisdiction within this District and Division, and a substantial part of the events and omissions giving rise to these claims occurred in this District and Division.

## PARTIES

5.     At all times relevant herein, named Plaintiff was a citizen of the United States and resident of New York.

6.     At times relevant herein, Defendant conducted business within this District and Division.

7.    At times relevant herein, Defendant was an "employer" within the meaning of New York Labor Law Articles 6 and 19.

8.    At times relevant herein, Plaintiff and other members of the proposed class were "employees" within the meaning of New York Labor Law Articles 6 and 19.

## FACTUAL ALLEGATIONS

9.    Defendant operates thousands of electronics retail stores nationwide.

10.    Plaintiff was employed by Defendant between approximately October 2008 and December, 2011.

11.    Plaintiff was employed as a non-exempt store manager in one of Defendant's retail stores in Tonawanda, New York.

12.    Other similarly-situated employees were employed by Defendant as non-exempt store managers in all parts of New York, including but not limited to, this District and Division.

13.    Plaintiff and other similarly-situated store managers worked over 40 hours a week.

14.    Plaintiff and other similarly-situated store managers were paid according to Defendant's "Non-Exempt Store Manager Compensation Plan" for "Non-California Stores" ("Compensation Plan"). *See* Exhibit 1.

15.    The Compensation Plan "applies to managers of RadioShack retail stores other than California with an annual sales volume of less than $750,000."

16.    Pursuant to the Compensation Plan, Plaintiff and other similarly-situated store managers were "paid a base salary for all hours worked each workweek."

17.    In addition, Plaintiff and other similarly-situated store managers received quarterly and year-end bonuses "based on the performance of the store to which the Store

Manager is assigned."

18.    Plaintiff and other similarly-situated store managers were also paid overtime compensation "at one-half [their] calculated regular rate (obtained by dividing the total number of hours worked in the workweek into the weekly base salary amount for all hours worked over forty... in any workweek)."

19.    Defendant attempted to pay Plaintiff and other similarly-situated store managers according to the U.S. Department of Labor's Fluctuating Workweek ("FWW") method of payment found at 29 C.F.R. § 778.114.

20.    On April 5, 2011, the U.S. Department of Labor published a Final Rule stating that the payment of bonuses is incompatible with the FWW method ("The Department has carefully considered all of the comments submitted on this section. While the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114."). *See* Exhibit 2

21.    The U.S. Department of Labor's Final Rule became effective May 5, 2011.

22.    Therefore, since May 5, 2011, the FWW method of calculating overtime used by Defendant has been incompatible with bonus payments.

23.    Defendant is liable for its use of the FWW method between May 5, 2011 and the present.

24.    Plaintiff and other similarly-situated store managers are entitled to back overtime compensation using the default method of calculating overtime at one and one-half times their regular rate of pay for the hours they worked over 40 in a workweek.

## NEW YORK CLASS ALLEGATIONS

25.     Plaintiff brings Count I of this action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of named Plaintiff and all other members of the class ("the New York Class") defined as:

> All former and current non-exempt store managers of RadioShack retail stores in New York with an annual sales volume less than $750,000, at any time between May 5, 2011 and the present.

26.     The New York Class is so numerous that joinder of all class members is impracticable.  Plaintiff is unable to state at this time the exact size of the potential class, but upon information and belief, avers that it consists of no less than several hundred persons.

27.     There are questions of law or fact common to the New York Class, including but not limited to the following:

(a)     whether Defendant unlawfully used the FWW in calculating the overtime compensation of named Plaintiff and other members of the New York Class;

(b)     whether Defendant, as a result of unlawfully using the FWW to calculate their overtime compensation, violated New York Labor Law Articles 6 and 19 by failing to pay named Plaintiff and other members of the New York Class at the prescribed rate of one and one-half times the employees' regular wage rates for all overtime hours worked;

(c)     what amount of monetary relief will compensate named Plaintiff and other members of the New York class for Defendant's violation of New York Labor Law Articles 6 and 19.

28.     The claims of Plaintiff are typical of the claims of other members of the New York Class.  Plaintiff's claims arise out of the same uniform course of conduct by Defendant, and are based on the same legal theories, as the claims of other New York Class members.

29.     Plaintiff will fairly and adequately protect the interests of the New York Class. Plaintiff's interests are not antagonistic to, but rather are in unison with, the interests of other

New York Class members. Plaintiff's counsel have broad experience in handling class action litigation, including wage-and-hour litigation, and are fully qualified to prosecute the claims of the New York Class in this case.

30.    The questions of law or fact that are common to the New York Class predominate over any questions affecting only individual members. The primary questions that will determine Defendant's liability to the New York Class, listed above, are common to the New York Class as a whole, and predominate over any questions affecting only individual class members.

31.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Requiring New York Class members to pursue their claims individually would entail a host of separate suits, with concomitant duplication of costs, attorneys fees, and demands on court resources. Many class members' claims are sufficiently small that they would be reluctant to incur the substantial cost, expense, and risk of pursuing their claims individually. Certification of this case pursuant to Fed. R. Civ. P. 23 will enable the issues to be adjudicated for all class members with the efficiencies of class litigation.

## COUNT ONE
### (Violations of New York Labor Law Articles 6 and 19)

32.    Plaintiff incorporates by reference the foregoing allegations as if fully rewritten herein.

33.    New York Labor Law Article 19 provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 USC 201 et seq., the 'Fair Labor Standards Act of 1938, as amended." *See* Article 19 § 142-2.2

34.    Having used the FWW method under circumstances not permitted by 29 C.F.R. §

778.114, Defendant failed to pay overtime compensation to named Plaintiff and other members of the New York Class "in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 USC 201 et seq., the 'Fair Labor Standards Act of 1938, as amended." On the contrary, Defendant's payments of overtime compensation to Plaintiff and other New York Class members violated section 7 of the FLSA, 29 U.S.C. § 207, and therefore violated New York Labor Law Article 19.

35.     As a result of Defendant's violation of New York Labor Law Article 19, Plaintiff and other members of the New York Class have been damaged in that they have not received wages due to them pursuant to New York Labor Law Article 19.

36.     Plaintiff and other members of the New York Class are entitled to back overtime compensation using the default method of calculating overtime at one and one-half times their regular rate of pay for the hours they worked over 40 in a workweek, New York Labor Law Articles 6 and 19.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, and all those similarly situated, collectively pray that this Court:

A.     Issue an order permitting this litigation to proceed as a class action, and certifying the New York Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

B.     Order prompt notice to all class members that this litigation is pending;

C.     Award Plaintiff and the class he represents actual damages for unpaid overtime compensation;

D.     Award Plaintiff and the class he represents liquidated damages;

E.     Award Plaintiff and the class he represents pre- and post-judgment interest at the

statutory rate;

F.    Award Plaintiff and the class he represents attorneys' fees, costs, and disbursements; and

G.    Award Plaintiff and the class he represents further and additional relief as this Court deems just and proper.

Respectfully submitted,

**GREEN SAVITS & LENZO, LLC**

By:_____
   **GLEN D. SAVITS**

Dated: April 22, 2013

/s/ Jason R. Bristol
Jason R. Bristol
Cohen Rosenthal & Kramer LLP
(will file for admission *pro hac vice*)
jbristol@crklaw.com
The Hoyt Block Building – Suite 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
216-781-7956 [Telephone]
216-781-8061 [Facsimile]

/s/ Anthony J. Lazzaro
Anthony J. Lazzaro
The Lazzaro Law Firm, LLC
(will file for admission *pro hac vice*)
anthony@lazzarolawfirm.com
920 Rockefeller Building
614 W. Superior Avenue
Cleveland, Ohio 44113
216-696-5000 [Telephone]
216-696-7005 [Facsimile]

/s/ Thomas A. Downie
Thomas A. Downie
(will file for admission *pro hac vice*)
tom@chagrinlaw.com
46 Chagrin Falls Plaza #104
Chagrin Falls, Ohio 44022
440-973-9000 [Telephone]
440-210-4610 [Facsimile]

Attorneys for Plaintiff

## JURY DEMAND

Plaintiff demands a trial by jury on all eligible claims and issues.

**GREEN SAVITS & LENZO, LLC**

By: _____
    **GLEN D. SAVITS**

Dated: April __, 2013

/s/ Jason R. Bristol
Jason R. Bristol
Cohen Rosenthal & Kramer LLP
(will file for admission *pro hac vice*)
jbristol@crklaw.com
The Hoyt Block Building – Suite 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
216-781-7956 [Telephone]
216-781-8061 [Facsimile]

/s/ Anthony J. Lazzaro
Anthony J. Lazzaro
The Lazzaro Law Firm, LLC
(will file for admission *pro hac vice*)
anthony@lazzarolawfirm.com
920 Rockefeller Building
614 W. Superior Avenue
Cleveland, Ohio 44113
216-696-5000 [Telephone]
216-696-7005 [Facsimile]

  /s/ Thomas A. Downie
Thomas A. Downie
(will file for admission *pro hac vice*)
tom@chagrinlaw.com
46 Chagrin Falls Plaza #104
Chagrin Falls, Ohio 44022
440-973-9000 [Telephone]
440-210-4610 [Facsimile]

Attorneys for Plaintiff

# EXHIBIT 1

# 2011 Non-Exempt Store Manager Compensation Plan

**(Non-California Stores)**
Last Revised: 02/01/2011

For definitions and generally-applied policies see the document titled RadioShack Compensation Plan General Information for Store Managers.

- **Effective Date:** This compensation plan is effective February 1, 2011.

- **Applicability:** This compensation plan applies to managers of RadioShack retail stores other than California with an annual sales volume less than $750,000.

- **Overtime:** The Non-Exempt Store Manager is eligible to receive overtime.  Overtime will be paid on all earnings in accordance with applicable State and Federal law. Overtime on the weekly base salary amount will be paid at one-half the calculated regular rate (obtained by dividing the total number of hours worked in the workweek into the weekly base salary amount for all hours worked over forty (40) in any workweek.

- **Base Salary:** The Non-Exempt Store Manager shall be paid a base salary for all hours worked each workweek on the regular weekly or bi-weekly pay cycle for the store where the Non-Exempt Store Manager is employed.

- **SPIFFs:** The Non-Exempt Store Manager will be eligible to receive SPIFFs for products and services personally sold in the wireless and Dish Network categories.

- **Bonus:** The Non-Exempt Store Manager may be eligible to receive a bonus based on the performance of the store to which the Store Manager is assigned.  The bonus target is 20% of base salary and is earned as follows:

- **Quarterly Bonus:** 50% of the bonus target will be allocated into 4 equal quarterly increments (Quarterly Target). The Quarterly Bonus may be earned based on actual sales performance compared to sales plan. The Quarterly Bonus will be subject to a sliding scale that provides for a minimum 25% payout for 95% actual sales performance compared to plan. The maximum payout is 150% for 120% or better actual sales performance compared to plan. To qualify, a Non-Exempt Store Manager must achieve 94.5% or more of the quarterly sales plan and 84.5% or more of the NPBB plan. Each quarter is considered an individual opportunity and each quarter's performance stands alone in determining the quarterly payout.  The Quarterly Bonus will be prorated based upon the number of months the Non-Exempt Store Manager was the Store Manager of Record during the quarter.

  - ➤ **The Quarterly Bonus will be calculated as follows.** Determine the percentage of actual sales compared to plan achieved for the quarter, rounding up to the next whole percentage if 0.5 or higher.  Locate the applicable % of Quarterly Bonus Earned in the column to the right. The % of Quarterly Bonus Earned is then multiplied by the Non-Exempt Store Manager's Quarterly Target to determine the amount of Quarterly Bonus. The Sliding Scale is included in the table to show how bonus increases based upon the percentage of actual sales performance to plan achieved.

| % of Sales to Plan Achieved | % of Quarterly Bonus Earned (Sliding Scale) |
|---|---|
|  |  |

Exhibit 1

| | |
|---|---|
| 95% | 25.0% |
| 96% | 40.0% |
| 97% | 55.0% |
| 98% | 70.0% |
| 99% | 85.0% |
| 100% | 100.0% |
| 101% | 102.5% |
| 102% | 105.0% |
| 103% | 107.5% |
| 104% | 110.0% |
| 105% | 112.5% |
| 106% | 115.0% |
| 107% | 117.5% |
| 108% | 120.0% |
| 109% | 122.5% |
| 110% | 125.0% |
| 111% | 127.5% |
| 112% | 130.0% |
| 113% | 132.5% |
| 114% | 135.0% |
| 115% | 137.5% |
| 116% | 140.0% |
| 117% | 142.5% |
| 118% | 145.0% |
| 119% | 147.5% |
| 120% | 150.0% |

➢  Example:

| | Sales | NPBB |
|---|---|---|
| Planned Quarterly Results | $80,000 | $12,800 |
| Actual Quarterly Results | $83,600 | $11,776 |
| % of Plan Achieved | 104.5% | 92.0% |
| Actual NPBB at Least 84.5% of Plan? | | Yes |
| | | |
| Store Manager Base Pay | | $25,618.00 |
| Bonus Target % | | 20% |
| Annual Bonus Target Opportunity | | $5,123.60 |
| 50% of Bonus Target Opportunity | | $2,561.80 |
| Quarterly Bonus Target Opportunity (Quarterly Target) | | $640.45 |
| % of Quarterly Bonus Earned | | x    112.5% |
| Quarterly Bonus Earned | | $720.51 |

- **Year End Bonus:** The remaining 50% of the bonus target will be based on Net Profit Before Bonus (NPBB) performance for the Company's fiscal year (Year End Target). The Year End Bonus may be earned based on the Store's actual NPBB performance compared to plan. The Year End Bonus will be subject to a sliding scale that provides for a minimum 25% payout for 85% NPBB

performance compared to plan. The maximum payout is 150% for 115% or better NPBB performance compared to plan. To qualify, the Non-Exempt Store Manager must achieve 84.5% or more of the NPBB plan.  The Year End Bonus will be prorated based on the number of months the Non-Exempt Store Manager was the Store Manager of Record, if the Non-Exempt Store Manager's tenure is less than a year.

➢ **Year End Bonus will be calculated as follows:**  Determine the percentage of actual NPBB performance compared to plan achieved for the year, rounding up to the next whole percentage if 0.5 or higher.  Locate the applicable % of Year End Bonus Earned in the column to the right.  The % of Year End Bonus Earned is then multiplied by the Non-Exempt Store Manager's Year End Target to determine the amount of Year End Bonus. The Sliding Scale is included in the table to show how bonus increases based upon the percentage of actual NPBB to plan achieved.

| % of NPBB to Plan Achieved | % of Year-end Bonus Earned (Sliding Scale) |
|---|---|
| 85% | 25.00% |
| 86% | 30.00% |
| 87% | 35.00% |
| 88% | 40.00% |
| 89% | 45.00% |
| 90% | 50.00% |
| 91% | 55.00% |
| 92% | 60.00% |
| 93% | 65.00% |
| 94% | 70.00% |
| 95% | 75.00% |
| 96% | 80.00% |
| 97% | 85.00% |
| 98% | 90.00% |
| 99% | 95.00% |
| 100% | 100.00% |
| 101% | 103.33% |
| 102% | 106.67% |
| 103% | 110.00% |
| 104% | 113.33% |
| 105% | 116.67% |
| 106% | 120.00% |
| 107% | 123.33% |
| 108% | 126.67% |
| 109% | 130.00% |
| 110% | 133.33% |
| 111% | 136.67% |
| 112% | 140.00% |
| 113% | 143.33% |
| 114% | 146.67% |
| 115% | 150.00% |

➢  Example:

| Planned Annual Results | $160,000 |
|---|---|
| Actual Annual Results | $176,800 |
| % of NPBB Plan Achieved | 110.50% |
| | |
| Store Manager Base Pay | $25,618.00 |
| Bonus Target % | 20% |
| Annual Bonus Target Opportunity | $5,123.60 |
| 50% of Bonus Target Opportunity (Year End Target) | $2,561.80 |
| % of Year End Bonus Earned | x    136.67% |
| Year End Bonus Earned | $3,501.21 |

- **Payroll Code, Status, etc:** The position of Non-Exempt Store Manager is authorized for full-line stores. The manager must be employed on a full-time basis. Temporary status is not authorized. Payroll Code "MN" or "LN" is assigned to this position and must be shown on the Personnel Change Record (PCR). The District Manager or a higher position must authorize Personnel Change Records to this position.



**RadioShack**

# EXHIBIT 2



# FEDERAL REGISTER

Vol. 76        Tuesday,

No. 65         April 5, 2011

Part II

Department of Labor

Office of the Secretary
Wage and Hour Division

29 CFR Part 4, 516, 531, *et al.*
Updating Regulations Issued Under the Fair Labor Standards Act; Final
Rule

**Exhibit 2**

**DEPARTMENT OF LABOR**

**Office of the Secretary**

**29 CFR Part 4**

**Wage and Hour Division**

**29 CFR Parts 516, 531, 553, 778, 779, 780, 785, 786, and 790**

**RIN 1215–AB13, 1235–AA00**

**Updating Regulations Issued Under the Fair Labor Standards Act**

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Department of Labor (Department or DOL) revises regulations issued pursuant to the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947 (Portal Act) that have become out of date because of subsequent legislation. These revisions conform the regulations to FLSA amendments passed in 1974, 1977, 1996, 1997, 1998, 1999, 2000, and 2007, and Portal Act amendments passed in 1996.

**DATES:** *Effective Date:* These rules are effective on May 5, 2011.

**FOR FURTHER INFORMATION CONTACT:** Montaneil Navarro, Wage and Hour Division, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue, NW., Washington, DC 20210; *telephone:* (202) 693–0067 (this is not a toll-free number). Copies of this final rule may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0023 (not a toll-free number). TTY/TDD callers may dial toll-free (877) 889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency may be directed to the nearest Wage and Hour Division (WHD) District Office. Locate the nearest office by calling our toll-free help line at (866) 4USWAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or log onto the WHD's Web site for a nationwide listing of Wage and Hour District and Area Offices at: *http://www.dol.gov/esa/contacts/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:** The Regulatory Information Number (RIN) identified for this rulemaking changed with the publication of the 2010 Spring Regulatory Agenda due to an organizational restructuring. The old RIN was assigned to the Employment Standards Administration, which no longer exists. A new RIN has been assigned to the WHD.

**I. Overview of Changes**

The FLSA requires covered employers to pay their nonexempt employees a Federal minimum wage and overtime premium pay of time and one-half the regular rate of pay for hours worked in excess of forty (40) in a work week. The FLSA also contains a number of exemptions from the minimum wage and overtime pay requirements.

Over the years, Congress has amended the FLSA to refine or to add to these exemptions and to clarify the minimum wage and overtime pay requirements. A 1974 amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10), extended an overtime exemption to include any salesman primarily engaged in selling boats and eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. Congress also in 1974 revised aspects of the FLSA's tip credit provisions, 29 U.S.C. 203(m) and (t), which were further revised by amendments enacted in 1977 and 1996. As part of the Small Business Job Protection Act of 1996, Congress amended section 4(a) of the Portal Act, 29 U.S.C. 254(a), to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes. The 1996 Act also created a youth opportunity wage of $4.25 per hour under section 6(g) of the FLSA, 29 U.S.C. 206(g). In 1997, Congress amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), to expand the exemption from overtime pay for workers on ditches, canals, and reservoirs when 90% (rather than 100%) of the water is used for agricultural purposes. In 1998, Congress added section 3(e)(5) to the FLSA, 29 U.S.C. 203(e)(5), to provide that the term "employee" does not include individuals who volunteer to private non-profit food banks solely for humanitarian purposes and who receive groceries from those food banks. In 1999, Congress added section 3(y) to the FLSA, 29 U.S.C. 203(y), to define an employee who is engaged in "fire protection activities." In 2000, Congress added section 7(e)(8) to the FLSA, 29 U.S.C. 207(e)(8), that treats stock options meeting certain criteria as an additional type of remuneration that is excludable from the computation of the regular rate. As part of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Congress increased the FLSA minimum wage in three steps: to $5.85 per hour effective

July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009.

Additionally, a number of courts have examined the interpretation of the FLSA's compensatory time provisions in section 7(o)(5) concerning public agency employers' obligation to grant employees' requests to use "comp time" within a "reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency." 29 U.S.C. 207(o)(5). Finally, the regulations governing the "fluctuating workweek" method of computing half-time overtime pay for salaried nonexempt employees, who work variable or fluctuating hours from week to week need updating to delete outmoded examples.

The Department published a notice of proposed rulemaking (NPRM) in the **Federal Register** on July 28, 2008 (73 FR 43654 (Jul. 28, 2008)), inviting comments on revisions to the regulations to implement these statutory amendments and to address the issues raised by the courts. Comments were due on or before September 11, 2008. In response to a number of requests for an extension of the time period for filing written comments, the Department on August 22, 2008 (73 FR 49621 (Aug. 22, 2008)) extended the deadline 15 days to September 26, 2008. The Department received approximately 30 substantive comments in response to the NPRM from a variety of sources, including labor unions and other employee representatives, employees, employer organizations, governmental representatives, Members of Congress, and law firms. Comments may be viewed at *http://www.regulations.gov,* by searching for docket id: WHD–2008–0003.

The comments reflected a wide variety of views on the merits of particular sections of the proposed regulations. Many included substantive analyses of the proposed revisions. The Department acknowledges that there are strongly held views on several of the issues presented in this rulemaking, and it has carefully considered all of the comments, analyses, and arguments made for and against the proposed changes in developing this final rule. The Department has narrowed the scope of this final rule to address those sections which require change to reflect statutory enactment or outdated examples contained in the regulations and therefore is not proceeding with some of the changes proposed in the NPRM including proposed changes to regulations regarding compensatory time, the fluctuating workweek, and

meal credits. The Department is also not proceeding with the proposed rule that service managers, service writers, service advisors, and service salesman are exempted from the overtime provision. We have also further clarified the tip credit provision to reflect long-standing and settled WHD policy concerning the ownership of tips.

## II. Summary of Comments

This section presents a topical summary of the major comments received on the proposed revisions, together with a discussion of the changes that have been made in the final regulatory text in response to the comments received.

### 1. 2007 Amendment to the FLSA Minimum Wage

The U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Public Law 110–28, 121 Stat. 112 (May 25, 2007), included an amendment to the FLSA that increased the applicable Federal minimum wage under section 6(a) of the FLSA in three steps: to $5.85 per hour effective July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009. This legislation did not change the definition of "wage" in section 3(m) of the FLSA for purposes of applying the tip credit formula in determining the wage paid to a qualifying tipped employee. Thus, the minimum required cash (or "direct") wage for a tipped employee under the FLSA remains $2.13 per hour. The maximum allowable tip credit for Federal purposes under the FLSA increased as a result of the 2007 legislation, and is determined by subtracting $2.13 from the applicable minimum wage provided by section 6(a)(1) of the FLSA. See 29 U.S.C. 203(m).

The Department proposed changes in several of the FLSA's implementing regulations that cite to the applicable minimum wage to reflect these statutory changes, including at 29 CFR 516.28, 531.36, 531.37, 778.110, 778.111, 778.113, and 778.114, as well as changes to the McNamara-O'Hara Service Contract Act regulations to eliminate outdated references to the FLSA minimum wage in 29 CFR 4.159 and 4.167. The Department did not receive any comments specifically addressing these non-substantive conforming updates, although several commenters did commend the Department generally for its effort to update the regulations. See, e.g., Littler Mendelson, P.C., Chamber of Commerce, International Public

Management Association for Human Resources (IMPA–HR), the International Municipal Lawyers Association (IMLA), and the National League of Cities (NLC). Therefore, the final rule adopts the technical updates in these sections as proposed.

### 2. Small Business Job Protection Act of 1996

On August 20, 1996, Congress enacted the Small Business Job Protection Act of 1996 (SBJPA), Public Law 104–188, 100 Stat. 1755. SBJPA amended the Portal Act to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes. It also amended the FLSA by creating a youth opportunity wage and modifying the allowable tip credit.

#### A. Employee Commuting Flexibility Act of 1996

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a). The amendment, effective upon enactment, provides that

The use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

Employee Commuting Flexibility Act of 1996, Section 2102, 29 U.S.C. 254(a).

The House Committee Report states that the purpose of the amendment is to clarify how the Portal Act applies to "employee use of employer-provided vehicles for commuting at the beginning and end of the workday." H.R. Rep. No. 104–585, at 6 (1996). It states that such travel time is to be considered noncompensable if the use of the vehicle is "conducted under an agreement between the employer and the employee or the employee's representative." Id. at 4. The agreement may be a formal written agreement, a collective bargaining agreement, or an understanding based on established industry or company practices. Id.; see Rutti v. LoJack Corp., Inc., 596 F.3d 1046, 1052 (9th Cir. 2010). In addition, "the work sites must be located within the normal commuting area of the employer's establishment." H.R. Rep. No. 104–585, at 4. Activities that are merely incidental to the use of the vehicle for commuting at the start or

end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion. Id. at 5.

This statutory amendment to the Portal Act affects certain regulations in 29 CFR parts 785 and 790 issued pursuant to the FLSA and the Portal Act. Current section 785.9(a) explains the statutory provisions that exclude from work time certain "preliminary" and "postliminary" activities performed prior to or subsequent to the workday. The NPRM proposed to add to that section a new provision that activities incidental to the use of an employer-provided vehicle for commuting are not considered principal activities, and are not compensable, when they meet the requirements of the 1996 amendment. Current § 785.34 discusses the effect of section 4 of the Portal Act on determining whether time spent in travel is working time. The NPRM proposed to add a reference to the statutory conditions under which commuting in an employer-provided vehicle will not be considered part of the employee's principal activities and therefore not compensable. The NPRM also proposed to revise §§ 785.50 and 790.3 to incorporate the 1996 amendment into the quotation of section 4 of the Portal Act.

A number of commenters addressed this proposal. Several commenters noted that the proposal simply quotes the statutory text in the regulation, and they stated that the proposal therefore does not provide adequate guidance regarding the limited impact of this amendment. See National Employment Lawyers Association ("NELA"), American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO"), National Employment Law Project ("NELP"), and Comments from Members of United States Congress. A variety of commenters representing employees suggested that the Department should emphasize the narrow nature of this amendment by stating that, under the continuous workday principle, it does not affect the compensability of hours worked within the workday (the time between when an employee commences a principal activity and the time the employee ceases a principal activity). See, e.g., NELA, NELP, North Carolina Justice Center, and Service Employees International Union ("SEIU"). They also suggested that the Department should include clarifying language, such as the statement that "otherwise non-compensable [traveling] is not compensable merely because the

employee uses his employer's vehicle * * * Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle." *See, e.g.,* NELP (quoting *Burton* v. *Hillsborough County,* 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished)), NELA, North Carolina Justice Center, and Greater Boston Legal Services. They also emphasized that the amendment did not change the analysis of what constitutes a "principal" work activity that is compensable. *See* NELP, SEIU, and NELA. These commenters cited court decisions addressing commuting time issues, some of which they thought were correctly decided and some of which they thought were wrong. Many of the commenters suggested that the Department should withdraw its proposal and reissue a new NPRM that would provide concrete examples of what constitutes an activity that is "incidental" to commuting and what activities are compensable. *See, e.g.,* AFL–CIO, SEIU, NELP, and NELA.

Commenters representing employers approved of the addition of language to the regulations to conform them to the Employee Commuting Flexibility Act. *See* Chamber of Commerce, Littler Mendelson, P.C., Society for Human Resource Management ("SHRM"), and National Automobile Dealers Association. Both the Chamber of Commerce and Littler Mendelson stated that it would be helpful for the Department to provide further guidance regarding issues such as what types of activities are incidental to the use of a vehicle for commuting, how the normal commuting area of the employer's business is determined, and what constitutes an agreement regarding the use of an employer-provided vehicle. Both commenters cited court decisions addressing these issues (holding, for example, that transporting tools and equipment during a commute is incidental; that normal commuting area is determined on a case-by-case basis; and that a formal written agreement is not necessary).

SHRM also suggested that the final rule should state that employees should not incur any out-of-pocket expenses related to commuting, such as for gas, tolls, parking or maintaining the employer's vehicle. The Department notes that the House Committee Report similarly stated that "[i]t is the intent of the Committee that the employee incur no out-of-pocket or direct cost for driving, parking or otherwise maintaining the employer's vehicle in connection with commuting in employer-provided vehicles." H.R. Rep. No. 104–585, at 5. While the

Department has not added language to this effect to the final rule, it notes that its longstanding interpretation of the amendment comports with both the Committee report and SHRM's comment. *See* Wage and Hour Opinion Letter 2001–11 (April 18, 2001).

As the comments from both employee and employer representatives show, the question of the compensability of employees' commuting time is an important issue. Therefore, the Department does not believe that it would be helpful or appropriate to leave the regulations inconsistent with the statute while it simply starts the NPRM process anew, as a number of employee representatives suggested. Rather, in order to avoid confusion and needless litigation, the Department continues to believe that it is important to update the regulations to reflect the current state of the law by incorporating the statutory provisions of the Employee Commuting Flexibility Act into the regulations. Furthermore, the cases that both employee and employer representatives cited show that issues related to the compensability of driving time and other activities are very fact-specific and must be resolved on a case-by-case basis, in light of all the factors present in the particular situation. As a result, the Department does not believe that it would be useful to include examples in the regulatory text. The Department will consider providing additional guidance at a later date on these and other issues, such as commuting distance, costs, incidental activities, and the nature of the agreement through non-regulatory means. Similarly, because the regulations in 29 CFR part 790 already fully address issues related to the continuous workday principle and principal activities, the Department does not believe it is necessary to add to those regulations. The Department does observe, however, that nothing in the Employee Commuting Flexibility Act or this regulation alters or supersedes continuous workday principles. Only commuting time that occurs before the first principle activity or after the last principle activity in the workday is excluded from compensable time. Therefore, the final rule adopts the changes to §§ 785.9(a), 785.34, 785.50 and 790.3 as proposed.

## B. Youth Opportunity Wage

Section 2105 of the SBJPA amended the FLSA by adding section 6(g), which provides that "[a]ny employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour."

29 U.S.C. 206(g)(1). This subminimum wage "shall only apply to an employee who has not attained the age of 20 years." 29 U.S.C. 206(g)(4). The amendment also protects current workers by prohibiting employers from taking action to displace employees, including reducing hours, wages, or employment benefits, for the purpose of hiring workers at the opportunity wage. 29 U.S.C. 206(g)(2). It also states that any employer violating this subsection shall be considered to have violated the anti-discrimination provisions of section 15(a)(3) of the FLSA. 29 U.S.C. 206(g)(3).

The NPRM proposed to add a new subpart G to 29 CFR part 786 to set forth the provisions of the youth opportunity wage. The Department received one comment regarding this update. The National Automobile Dealers Association stated that it supported the proposal. The final rule adopts the new subpart G as proposed but changes the title to "Miscellaneous Exemptions and Exclusions from Coverage."

## C. Tip Credit Amendments of 1996

Section 2105 of Title II of the SBJPA also amended section 3(m) of the FLSA, 29 U.S.C. 203(m), by providing that

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 6(a)(1). The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law 104–188, § 2105(b) (1996). Prior to the 1996 amendments, section 3(m) of the FLSA required an employer to pay its tipped employees a cash wage equal to 50 percent of the minimum wage (then $4.25 an hour). *See* Public Law 101–157, § 5 (1989). As amended, section 3(m)(1) provides that an employer's minimum cash wage obligation to its tipped employees is the minimum cash wage required on August 20, 1996, the date of the SBJPA enactment. Thus, section 3(m)(1)

established an employer's minimum cash wage obligations to tipped employees at the pre-SBJPA amount: 50 percent of the then-minimum wage of $4.25 per hour, or $2.13 per hour. *See* 29 U.S.C. 203(m)(1).

Subsection (2) of the 1996 amendments bases an employer's maximum allowable tip credit on a specific formula in relation to the applicable minimum wage, stating that an employer may take a tip credit equal to the difference between the required minimum cash wage specified in paragraph 3(m)(1) ($2.13) and the minimum wage ($7.25 effective July 24, 2009). Thus, the maximum Federal tip credit that an employer currently is permitted to claim under the FLSA is $7.25 minus $2.13, or $5.12 per hour.

As explained in the NPRM, this 1996 amendment affects certain regulations in 29 CFR part 531. Current § 531.50(a) quotes section 3(m) of the FLSA as it appeared in 1967, when the regulation was published. To incorporate the 1996 amendment, the NPRM proposed to replace the old statutory language with the current statutory provision. Current §§ 531.56(d), 531.59, and 531.60 refer to the pre-1996 statutory language setting the tip credit at 50 percent of the minimum wage. The proposed rule deleted or changed these references to reflect the current statutory requirements (maximum tip credit equaling the difference between the minimum wage required by section 6(a)(1) of the FLSA and the $2.13 required cash wage). Additional changes related to tipped employees are discussed in this preamble at sections 7B and 8, *infra*.

The Department received many comments relating to tipped employees; however, those comments generally addressed the issues discussed *infra* in sections 7B and 8 of this preamble, not the technical changes to the formula for computing the tip credit addressed here. The Chamber of Commerce and Littler Mendelson, P.C., stated that they supported these changes to the regulations to conform them to the statutory amendments, thereby clarifying that employers are only required to pay $2.13 per hour in cash wages regardless of what the minimum wage is. The Chamber of Commerce also noted that there was a typographical error in § 531.59(b); the cross-reference to § 531.31 should have referred to § 531.54. Because the Department received no other substantive comments relating to these issues, and having the regulations consistent with the statute will help to eliminate confusion, the final rule adopts the changes to §§ 531.50(a), 531.56(d), 531.59 and

531.60 related to the statutory tip credit calculation as proposed, except for the correction of a typographical error in 531.50(a) and the cross-reference in § 531.59.

### 3. Agricultural Workers on Water Storage/Irrigation Projects

Section 105 of The Departments of Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, Public Law 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), which provides an overtime exemption for agricultural employees and employees employed in connection with the operation or maintenance of certain waterways used for supply and storing of water for agricultural purposes. The 1997 amendment deleted "water for agricultural purposes" and substituted "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." Thus, this amendment makes the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects when at least 90 percent of the water is used for agricultural purposes, rather than when the water is used exclusively for agricultural purposes.

The NPRM proposed to update the regulations in 29 CFR part 780, Subpart E to incorporate the statutory amendment. Thus, proposed § 780.400 correctly quoted the statute, including the amendment. Proposed § 780.401 provided an updated general explanatory statement of the history of the exemption. Proposed § 780.406 deleted the last sentence of the current rule, which refers to the 1966 amendments, as no longer necessary. Proposed § 780.408 was updated to describe the "at least 90 percent" requirement for using the water for agricultural purposes.

The Department received one comment addressing this proposal. The AFL–CIO noted that current § 780.408 states that if a small amount of water is used by the farmer for domestic purposes, this does not prevent the application of the exemption. The AFL–CIO stated that the "[t]olerance for a 'small amount' of water that is used for domestic purposes may have made sense under the old statutory provision, which required exclusive use of the water for agricultural purposes. However, now that Congress has amended the exemption to permit 10 percent of the water for non-agricultural purposes, there is no longer any justification for this exception. Any water that is used for 'domestic purposes' (that is, non-agricultural

purposes) should count toward the new statutory 10 percent tolerance."

The Department agrees that, in light of the 10 percent tolerance for water used for non-agricultural purposes, there is no longer any need for the specific tolerance of domestic use by a farmer. Therefore, the final rule further modifies proposed § 780.408 to delete the three sentences relating to domestic use on farms. The final rule adopts §§ 780.400, 780.401 and 780.406 as proposed.

### 4. Certain Volunteers at Private Non-Profit Food Banks

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at a private non-profit food bank and who receive groceries from those food banks. 29 U.S.C. 203(e)(5). The proposed rule renamed 29 CFR part 786 "Miscellaneous Exemptions and Exclusions From Coverage" and added subpart H to set forth this exclusion from FLSA coverage. The Department did not receive any comments specifically addressing this section of the NPRM. The final rule adopts subpart H as proposed.

### 5. Employees Engaged in Fire Protection Activities

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This amendment states that an "employee in fire protection activities" means

an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous material worker, who—(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

Public Law 106–151, 113 Stat. 1731 (1999); 29 U.S.C. 203(y). Such employees may be covered by the partial overtime exemption allowed by § 7(k) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20). 29 U.S.C. 207(k); 213(b)(20).

The NPRM proposed to make several revisions to 29 CFR part 553, subpart C,

to incorporate this amendment. In the first sentence of proposed § 553.210(a), the statutory amendment language was substituted for the current four-part regulatory definition of the current "any employee * * * in fire protection activities." The proposed rule also deleted the last sentence of current § 553.210(a) stating that, "[t]he term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection services," and it deleted the cross-reference to § 553.215. The "integral part" test for the public agency employees is no longer needed because the new statutory standards define when such rescue and ambulance personnel qualify as employees in fire protection activities. Section 553.215(a) of the current rule discusses ambulance and rescue service employees who are employees of a public agency other than a fire protection or law enforcement agency. The section 3(y) amendment, however, specifically states that one of the requirements to be an "employee in fire protection activities" is that the employee is employed by a fire department of a municipality, county, fire district, or State. The proposed rule, therefore, deleted § 553.215(a) because it permits non-fire department public agencies to treat their ambulance and rescue service employees as employees engaged in fire protection activities, contrary to the new statutory provision. The proposed rule also deleted §§ 553.215(b) (stating that rescue service employees of hospitals and nursing homes cannot qualify for the exemption) and 553.215(c) (stating that ambulance and rescue service employees of private organizations do not come within the exemption) as unnecessary in light of the clear statutory requirement for employment by a fire department. Finally, in §§ 553.221, 553.222, 553.223, and 553.226, the Department proposed to substitute "employee in fire protection activities" or "employees in fire protection activities," respectively, wherever the terms "firefighter" or "firefighters" appeared.

The Department reexamined other regulations in part 553, Subpart C, in light of the section 3(y) amendment to assess whether any other changes were appropriate. Current § 553.210 characterizes as exempt work-related incidental activities, such as equipment maintenance, lecturing and fire prevention inspections. Current § 553.210 also recognizes that employees can be included within the exemption whether their status is "trainee," "probationary," or

"permanent," and regardless of their particular specialty or job title or assignment to certain support activities. The Department stated its belief in the NPRM that these provisions are consistent with statutory intent and remain the appropriate interpretation of the new statutory definition and, thus, the Department proposed no further changes to § 553.210.

Current § 553.212 recognizes that exempt employees may engage in some nonexempt work, such as firefighters who work for public forest conservation agencies and who plant trees and perform other conservation activities unrelated to their firefighting duties during slack times, and set a 20% tolerance for such work. As explained in the NPRM, the Department reexamined this regulation, particularly in light of *McGavock v. City of Water Valley*, 452 F.3d 423, 427–28 (5th Cir. 2006), in which the appellate court concluded that the 20% tolerance for nonexempt work in § 553.212 was rendered "obsolete and without effect" by the statutory amendment. 73 FR 43658 (Jul. 28, 2008); *see also Huff v. DeKalb County, Ga.*, 516 F.3d 1273, 1278 (11th Cir. 2008) (agreeing that new section 3(y) is a streamlined definition that made existing provisions in §§ 553.210 and 553.212 obsolete). The proposed rule therefore deleted § 553.212 as unnecessary in light of these court decisions and the new statutory definition of "employee[s] in fire protection activities" in section 3(y) of the Act.

The Department received several comments addressing these issues. The National Public Employment Labor Relations Association ("NPELRA") stated that the removal of the 20 percent test was "an important clarification" because it was obsolete and yet some people still believe that it applies. This commenter suggested that the rules should go further in describing the terms "legal authority and responsibility to engage in fire suppression" (as meaning that the employee who has been trained may engage in such tasks) and "is engaged in the prevention, control or extinguishment of fires" (because a fire department at an airport may extinguish a fire only once per year or less). The IMPA–HR, IMLA, and NLC stated that it was important to distinguish between the section 3(y)(1) tests relating to "the status of employees who are trained in fire suppression— that they have the legal authority and responsibility to engage in fire suppression and be employed by a public fire department"—and the disjunctive test in section 3(y)(2) relating to the duties of an employee,

which require "that the employee either be engaged in firefighting or respond to emergencies." They agreed with the court's statement in *McGavock* that "emergency personnel trained as firefighters could be exempt even if they 'spend one hundred percent of their time responding to medical emergencies.'" They suggested that the Department add a sentence in § 553.210 providing that emergency medical personnel who are employed by a fire department and trained in fire suppression will be exempt as long as they either are engaged in firefighting or respond to emergency situations.

On the other hand, William Pincus, an attorney representing firefighters, stated that the 20% test was not obsolete because, even after the section 3(y) amendment, it is still necessary to distinguish between exempt and nonexempt activities. The 20 percent test defines when employees who perform work that is nonexempt fall outside the exemption. This commenter cited a pre-amendment court decision holding that without the rule a public agency would be free to assign a firefighter to do any kind of work (road repair, sanitation, parks and recreation) without fear of losing the exemption, and stated that nothing in the amendment changes this analysis. The International Association of Fire Fighters ("IAFF") commented that the second sentence of proposed § 553.210(a) would create confusion because, by using the wording "the term includes", the proposal implies that employees engaged in incidental nonfirefighting functions such as equipment maintenance, attending community fire drills and inspecting homes for fire hazards are exempt even if they do not satisfy the section 3(y) statutory criteria. The IAFF also stated that the third sentence of this section is overbroad because is suggests that the term includes all "trainees." The IAFF stated that "trainees who have not completed requisite training and have no certification in fire suppression are neither 'trained,' nor have the 'legal authority * * * to engage,' in fire suppression." The commenter thus distinguished between a ten-year firefighter sent to a training course in hazardous materials who remains exempt and an untrained individual in an introductory fire suppression course before certification. This commenter further suggested that the third sentence, relating to employees assigned to support activities, is incorrect because "[w]here employees have been assigned to other jobs in which they do not have the authority or responsibility

to engage in fire suppression and/or they do not engage in fire protection activities or response to emergency situations, the employees do not fit the statutory definition." Finally, the IAFF stated that existing § 553.210(b) is obsolete, and the Department should remove it or explain why it is retained.

After careful review of the comments received on this issue and reexamining the legislative history of the section 3(y) amendment, it is the Department's view that the statutory definition of an "employee in fire protection activities" requires no further regulatory guidance at this time; however, the Department may provide additional guidance in the future, as appropriate. As a result, this final rule implements the proposed change to § 553.210(a) substituting the statutory amendment language for the current four-part regulatory definition of the term "any employee * * *" in fire protection activities." In addition, the Department is deleting the remainder of paragraph (a) as unnecessary due to the statutory definition. This change also removes language from the rule that commenters identified as confusing or inconsistent with FLSA section 3(y). Likewise, current paragraph (b) is deleted from this final rule because it is no longer necessary. Current paragraph (c) of § 553.210 will be redesignated as paragraph (b) in this final rule.

With regard to the 20 percent test, the Department continues to believe that Congress defined, without further limitation, the particular criteria for when an employee qualifies as "an employee in fire protection activities" in section 3(y). Thus, an employee who performs the described duties under the circumstances and the conditions set forth in section 3(y) is "an employee in fire protection activities" without regard to the 20 percent tolerance for nonexempt work contained in § 553.212 of the current rule. The specific definition adopted by Congress renders the 20 percent tolerance for nonexempt work applied under the former regulatory definition obsolete. However, § 553.212 also applies to employees engaged in law enforcement activities, and the definition of "an employee in fire protection activities" in section 3(y) does not impact those employees. Therefore, the final rule does not delete § 553.212(a) in its entirety; instead, it deletes from § 553.212(a) only the reference to employees engaged in "fire protection". The 20 percent tolerance for nonexempt work for employees engaged in law enforcement activities in section 553.212(a) will remain in effect. Likewise, since section 3(y) did not impact the applicability of section 7(p)(2)'s rule regarding the occasional or

sporadic employment of public agency employees, including fire protection and law enforcement personnel, the final rule also retains § 553.212(b), which discusses this statutory provision. Section 553.212(b) does contain a reference to the 20 percent tolerance for nonexempt work, and the final rule makes a slight modification to that section to make clear that the 20 percent tolerance is only applicable to law enforcement personnel.

With regard to the IAFF comments, the current regulation at § 553.214 directly addresses the status of trainees, and it clarifies that a trainee qualifies for exemption "only when the employee meets all the applicable tests described in § 553.210." The Department is not aware of instances of the exemption being claimed for trainees who have not gained certification and therefore do not have the legal authority or responsibility to engage in fire suppression, or of confusion surrounding this issue since passage of the section 3(y) amendment. Moreover, the Department believes that the statutory terms, such as legal authority and responsibility, should continue to be interpreted and applied on a case-by-case basis, based upon the specific facts in each situation, as reflected in Wage and Hour Opinion Letter FLSA 2006–20 (June 1, 2006). Therefore, no additional changes are required to implement this statutory provision.

### 6. Stock Options Excluded From the Computation of the Regular Rate

The Worker Economic Opportunity Act, Public Law 106–202, 114 Stat. 308 (May 18, 2000), amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds to the types of remuneration that are excluded from the computation of the regular rate when determining overtime pay "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7.

The proposed rule incorporated the amendments made by the Worker Economic Opportunity Act by adding to the regulatory provisions which simply quote the statute in § 778.200(a) and (b). Section 778.208 was also revised simply to update from "seven" to "eight" the

number of types of remuneration excluded in computing the regular rate.

Only two commenters addressed this section of the proposed rule. SHRM stated that "[t]his addition to the existing regulations is appropriate, and we encourage DOL to include it as proposed in its final rule." The AFL–CIO stated that the Department should do more than just restate the statutory language, specifically noting the need to clarify how an employer must communicate to employees the "terms and conditions" of stock benefit programs and under what "other circumstances" an employee may exercise a stock option or stock appreciation right in less than six months. The AFL–CIO did not offer any regulatory language or suggested solutions that it thought would be helpful, but only stated that the Department should withdraw the proposal and reissue a new NPRM providing further guidance.

The Department does not believe that it would be helpful or appropriate to leave the regulations inconsistent with the statute while it starts the NPRM process anew. Rather, in order to avoid confusion, the Department continues to believe that it is important to update the regulations to reflect the current state of the law by incorporating the Worker Economic Opportunity Act into the regulations. Therefore, the final rule adopts the changes to § 778.200 with minor editorial edits and § 778.208 as proposed. The Department will consider offering further guidance on the issues raised in the comments and other issues through non-regulatory means.

### 7. Fair Labor Standards Act Amendments of 1974

A. Service Advisors Working for Automobile Dealerships and Boat Salespersons

On April 7, 1974, Congress enacted an amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10). Public Law 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. The proposed rule revised 29 CFR part 779, Subpart D— Exemptions for Certain Retail or Service Establishments—to conform the regulations to this 1974 amendment. Section 779.371(a) was revised to reflect the amendment's addition of boat salespersons to the exemption. Proposed § 779.372(a) clarified that "any

salesman, partsman, or mechanic" primarily engaged in selling or servicing automobiles, trucks, or farm implements are covered by the exemption; and that salespersons primarily engaged in selling trailers, boats, or aircraft are also exempt, but not partsmen or mechanics for such vehicles. Portions of § 779.372(b) and (c) were also changed accordingly.

Section 13(b)(10)(A) of the FLSA provides that "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers" shall be exempt from the overtime requirements of the Act. 29 U.S.C. 213(b)(10)(A). The current regulation at 29 CFR 779.372(c)(4) states that an employee described as a service manager, service writer, service advisor, or service salesman who is not primarily engaged in the work of a salesman, partsman, or mechanic is not exempt under section 13(b)(10)(A).

As discussed in the preamble to the proposed rule, three appellate courts have held that service advisors are exempt under section 13(b)(10)(A) because they are "salesmen" who are primarily engaged in servicing automobiles. 73 FR 43658 (Jul. 28, 2008). Based upon the two earliest court decisions, the Wage and Hour Division in 1978 recognized in an Administrator-issued opinion letter that in certain circumstances service advisors or writers "can be properly regarded as engaged in selling activities." *See* Wage and Hour Opinion Letter WH–467, 1978 WL 51403 (July 28, 1978). The opinion letter noted, however, that this "would not be true in the case of warranty work, since the selling of the warranty is done by the vehicle salesman when the vehicle is sold, not by the service writer." Therefore, the NPRM proposed to change § 779.372(c), titled "Salesman, partsman, or mechanic," to follow the courts' holdings that employees performing the duties typical of service advisors are within the section 13(b)(10)(A) exemption. Section 779.372(c)(1) was revised to include such an employee as a salesman primarily engaged in servicing automobiles. Section 779.372(c)(4) was rewritten to clarify that such employees qualify for the exemption.

A number of commenters addressed this issue. The National Automobile Dealers Association stated that the retail automobile and truck dealership industry has relied upon the Administrator's 1978 opinion letter and

that it supported the proposed clarification that such employees are exempt. Littler Mendelson, P.C., similarly stated that it supported the change, because it "will eliminate confusion resulting from the inconsistency between the [Field Operations Handbook] and the current regulatory guidance, and is not a change in the law."

Other commenters disagreed with the proposed rule. The AFL–CIO stated that the proposal ignored congressional intent "to carve a narrow exemption for salesmen who work at automobile dealerships." The AFL–CIO, NELA, and NELP traced the legislative history, focusing on the addition of the requirement that the salesman must be "primarily engaged in selling or servicing such vehicles." These commenters disagreed with the court decisions interpreting the exemption, stating that service advisors merely coordinate between customers and the mechanics who actually perform the services, and that the exemption should not be extended to employees outside its plain language simply because they are "functionally similar" to an exempt employee. The AFL–CIO concluded that "neither integration with exempt employees nor the performance of functions related to those of exempt employees qualifies an employee as one who is *primarily engaged in either selling or servicing vehicles.*" (Emphasis in original). NELA concluded that the exemption "requires an employee to either primarily service the vehicle or 'sell' the vehicle—not sell the service of the vehicle, as *Walton* concluded." Comments submitted by Members of the United States Congress similarly opposed the Department's proposal, stating that the 1966 exemption only exempts salesmen who sell automobiles and mechanics who service automobiles, and not salesmen who sell services. They stated that the Department's proposal "would abandon its longstanding and correct interpretation of Section 13(b)(10)," and would ignore the Supreme Court's command to construe FLSA exemptions narrowly. *Id.*

The AFL–CIO stated that, if the Department does treat service writers as salesmen primarily engaged in servicing vehicles, then it urged the Department to exclude any time spent in "selling" warranty work from the determination of whether the writer has spent the majority of his time in selling, since that right to free parts and service has already been sold by the salesman of the vehicle. NELA stated that the proposed regulatory text was confusing because it appears to exempt service writers only

if they are selling the servicing of vehicles that the dealership sells, which would be difficult for both the employee and the employer to know. Both NELP and the North Carolina Justice Foundation commented that the proposal exempts service writers based upon their job title alone, rather than based upon an analysis of their actual job duties, which is contrary to the requirement to look at the circumstances of the whole activity.

Upon further consideration of the issue, the Department has decided not to adopt the proposed change to § 779.372(c)(4) to specifically include service managers, service writers, service advisors, or service salesmen as qualifying for exemption. As commenters point out, the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met. The Department notes that current § 779.372(c)(1) is based on its reading of 13(b)(10)(A) as limiting the exemption to salesmen who sell vehicles and partsmen and mechanics who service vehicles. The Department believes that this interpretation is reasonable and disagrees with the Fourth Circuit's conclusion in *Walton v. Greenbrier Ford, Inc.,* 370 F.3d 446, 452 (4th Cir. 2004), that the regulation impermissibly narrows the statute. Therefore, the Department has concluded that current 779.372(c) sets forth the appropriate approach to determining whether employees in such positions are subject to the exemption. However, the final rule adopts § 779.372(a)–(b) as proposed.

**B. Tipped Employees**

Section 3(m) of the FLSA defines the term "wage." The FLSA was amended in 1966 to include hotels and restaurants within the scope of its coverage for the first time. In order to alleviate these industries' new minimum wage obligations, the 1966 amendments also provided for the first time, within section 3(m)'s definition of a "wage," that an employer could utilize a limited amount of its employees' tips as a credit against its minimum wage obligations to those employees through a so-called "tip credit." The Department's current tip credit regulations were promulgated in 1967, one year after the tip credit was first introduced, and prior to the 1974 amendments to the FLSA, which amended the tip credit provision in section 3(m) by providing that an employer could not take a tip credit unless:

(1) [its] employee has been informed by the employer of the provisions of this subsection and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law 93–259, § 13(e), 88 Stat. 55 (1974). Thus, as amended in 1974, section 3(m) required that the employer inform its employees about the tip credit prior to utilizing it, required that a tipped employee retain all of his or her tips, and limited employer-imposed, mandatory tip pools to employees who "customarily and regularly receive tips."

The section 3(m) requirement that the employer "inform" its tipped employees of the provisions of section 3(m) prior to taking a tip credit has been strictly enforced by the Department and by the courts. Courts have disallowed the use of the tip credit for lack of notice even "where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements," remarking that "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." Reich v. Chez Robert, Inc., 28 F.3d 401, 404 (3d Cir. 1994) (citing Martin v. Tango's Restaurant, 969 F.2d 1319, 1323 (1st Cir. 1992)).

Prior to the 1974 amendments, the compensation of tipped employees was often a matter of agreement. Tipped employees could agree, for example, that an employer was only obligated to pay cash wages when an employee's tips were less than the minimum wage, or that the employee's tips would be turned over to the employer, who could then use the tips to pay the full minimum wage. See Usery v. Emersons Ltd., 1976 WL 1668, at *2 (E.D. Va. 1976), vacated and remanded on other grounds sub. nom. Marshall v. Emersons Ltd., 593 F.2d 565 (4th Cir. 1979). The 1974 section 3(m) amendments were intended to prohibit such agreements. See S. Rep. No. 93–690, at 43 (1974) ("The [retention requirement] is added to make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage."). The Department's current regulations, which were in effect prior to the 1974 amendments and allowed an employer to require employees to turn over all their tips to the employer, were therefore superseded by the statutory amendment to the extent that they permitted employers to utilize employees' tips to satisfy more than 50% of their minimum wage obligation.

Under the 1974 amendments to section 3(m), an employer's ability to utilize an employee's tips is limited to taking a credit against the employee's tips as permitted by section 3(m). Section 3(m) provides the only method by which an employer may use tips received by an employee. An employer's only options under section 3(m) are to take a credit against the employee's tips up to the statutory differential, or to pay the entire minimum wage directly. See Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (October 26, 1989) (defining when an employer does not claim a tip credit as when the employer does not retain any tips and pays the employee the minimum wage).

As amended in 1996, section 3(m) provides that the "wage" of a tipped employee equals the sum of the cash wage paid by the employer, which is fixed at a minimum of $2.13 an hour, and the amount it claims as a tip credit. The maximum permissible tip credit under section 3(m) is calculated using the current Federal minimum wage. Thus, in a situation in which an employee earns $10 an hour in tips and the employer pays $2.13 an hour in cash wages and claims the statutory maximum as a tip credit, the employee has received only the minimum wage because tips in excess of the maximum tip credit are not considered "wages" under 3(m). Using the current minimum wage of $7.25 an hour as an example, the maximum permissible tip credit is $7.25 minus $2.13, which permits the employer to take a tip credit against its minimum wage obligation of $5.12 an hour, provided it has informed its tipped employees of the tip credit provision and has permitted the employees to retain all of their tips.

Since the amount of tips the employee receives in excess of the allowable tip credit are not considered "wages" paid by the employer, any deductions by the employer from the employee's tips would result in a violation of the employer's minimum wage obligation because the employer has only paid the employee the minimum wage (cash wage of $2.13 plus the tip credit up to $7.25). A deduction from the employee's tips would be subtracted from the $7.25 minimum wage payment and would bring the employee below the minimum wage.

The NPRM proposed to update the regulations to incorporate the 1974 amendments, the legislative history, subsequent court decisions, and the Department's interpretations. Proposed §§ 531.52, 531.55(a), 531.55(b), and 531.59 eliminated references to employment agreements providing either that tips are the property of the

employer or that employees will turn tips over to their employers, and clarified that the availability of the tip credit provided by section 3(m) requires that all tips received must be paid out to tipped employees in accordance with the 1974 amendments. Section 531.55(a), which describes compulsory service charges, also was updated by changing the example of such a charge from 10 percent to 15 percent to reflect more current customary industry practices.

The 1974 amendments also clarified that section 3(m)'s statement that employees must retain their tips does not preclude the practice of tip pooling "among employees who customarily and regularly receive tips." 29 U.S.C. 203(m). The Department's regulation on the subject provides that "the amounts received and retained by each individual [through a tip pooling arrangement] as his own are counted as his tips for purposes of the Act." 29 CFR 531.54.

Wage and Hour has interpreted the tip pooling clause more fully in opinion letters and in its Field Operations Handbook ("FOH"). The FOH provides, for example, that a tip pooling arrangement cannot require employees to contribute a greater percentage of their tips to the tip pool than is "customary and reasonable." FOH section 30d04(b). The agency expanded upon this position, in its opinion letters and in litigation, that "customary and reasonable" equates to 15 percent of an employee's tips or two percent of daily gross sales. See, e.g., Wage and Hour Opinion Letter WH–468, 1978 WL 51429 (Sept. 5, 1978). Several courts have rejected the agency's maximum contribution percentages, however, "because neither the statute nor the regulations mention [the requirement stated in the agency interpretation] and the opinion letters do not explain the statutory source for the limitation that they create." Kilgore v. Outback Steakhouse of Fla., Inc., 160 F.3d 294, 302–03 (6th Cir. 1998); see Davis v. B&S, Inc., 38 F. Supp. 2d 707, 718 n.16 (N.D. Ind. 1998) (citing Dole v. Continental Cuisine, Inc., 751 F. Supp. 799, 803 (E.D. Ark. 1990) ("The Court can find no statutory or regulatory authority for the Secretary's opinion [articulated in an opinion letter] that contributions in excess of 15% of tips or 2% of daily gross sales are excessive."). In light of these court decisions, the NPRM proposed to update § 531.54 to clarify that section 3(m) of the FLSA does not impose a maximum tip pool contribution percentage. Moreover, the NPRM proposed to state that the

employer must inform each employee of the required tip pool contribution.

The 1974 amendments also revised another aspect of section 3(m). Prior to the 1974 amendments, section 3(m) of the FLSA provided that an employee could petition the Wage and Hour Administrator to review the tip credit claimed by an employer. See Public Law 89–601, 80 Stat. 830 (1966) ("[I]n the case of an employee who (either himself or acting through his representative) shows to the satisfaction of the Secretary that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased * * * the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount."). The 1974 amendments eliminated the review clause to clarify that the employer, not the employee, bears the ultimate burden of proving "the amount of tip credit, if any, [he] is entitled to claim." S. Rep. No. 93–690, at 43. Two outdated regulatory provisions promulgated in 1967, however, still purport to permit petitions to the Wage and Hour Administrator for tip credit review despite the fact that the statute no longer provides for this review. See 29 CFR 531.7, 531.59.

Consistent with the 1974 amendments, the NPRM proposed to delete § 531.7, which permits employees to petition the Wage and Hour Administrator for tip credit review. References to the Administrator's review in § 531.59 also were deleted, and the language was updated to reflect the burden on the employer to prove the amount of the tip credit to which it is entitled.

Numerous commenters addressed the issues relating to tipped employees.

i. Ownership of Employee Tips

Commenters representing employees expressed concern with several of the Department's proposed revisions. First, a variety of commenters stated that they were opposed to the Department's reference in § 531.52 to the fact that an employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage where "an employee is being paid wages no more than the minimum wage." See, e.g., NELA, AFL–CIO, Bruckner Burch PLLC, and NELP. These commenters further noted that the preamble addresses the converse situation where an employer does pay more than the minimum wage in cash, and the preamble states that such an employer "would be able to make

deductions so long as they did not reduce the direct wage payment below the minimum wage." 73 FR 43659 (Jul. 28, 2008). They objected to these statements, based upon the legislative history of the tip credit provisions.

These commenters pointed out that section 3(m) first was amended in 1966, following a Supreme Court decision that concluded that employers could use employees' tips to satisfy the entire minimum wage. That amendment provided that employers could credit tips toward 50 percent of the minimum wage. After the Wage and Hour Division issued regulations concluding that an employer could still require employees to turn over all their tips, effectively achieving a tip credit equal to 100 percent of the minimum wage, Congress again amended the statute in 1974 to provide that all tips received by an employee must be retained by the employee (except for valid, or bona fide, tip pooling). The commenters noted that the legislative history clarifies that Congress wanted in 1974 "to make clear [its] original * * * intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage." S. Rep. No. 93–690, at 43. Congress also made it clear in 1974 that "[a]ll tips received [by tipped employees were to] be paid out to tipped employees." Id., at 42. The commenters cited Wage and Hour opinion letters, the FOH and Fact Sheet #15 issued thereafter, which concluded that the 1974 Amendments clarified Congress' determination that tips are the property of the employees who receive them, not the employer, and that any agreement requiring an employee to turn over tips to the employer is, therefore, illegal.

Based upon this history, NELP stated that the proposed rule and the preamble language provides "misleading guidance on tips" and "threaten[s] to increase confusion in this already high-violation industry." NELP asserted that it would be unlawful for an employer to pay a worker a cash wage of $1.00 in excess of the full minimum wage and then withhold $1.00 per hour of a worker's tips, and that the Department "lacks the authority to create this exception to the general rule against tip stealing." NELP further concluded that the proposed regulations include misleading guidance that is "confusing and encourages abuse that would adversely impact both tipped workers and their employers." Employers would hire workers for a wage that appeared to exceed the minimum wage, but then would lower their pay back to the minimum wage, and such action would expose

"employers to significant liability because it is out of step with the many state laws prohibiting this action." See also North Carolina Justice Center.

NELA similarly stated that the proposed regulations "create confusion with respect to the ownership of tips" because they suggest that if an employer pays a direct (or cash) wage slightly in excess of the minimum wage, it can "thereby obtain unfettered access to its employees' tips." NELA stated that the confusion "is particularly dangerous given that some courts wrongly permit employers to pocket the tips of employees who are 'paid' at least the minimum wage." Therefore, NELA suggested that the Department should clarify that tips are the property of the employee who receives them and that the tip retention requirement applies even if the employer pays a wage in excess of the minimum wage.

The AFL–CIO similarly commented that the Department's regulatory "language—whether intended by the Department or the result of poor drafting—seems to permit employers to take the employee's tips if they are paid the minimum wage or greater * * * [which] was barred by Congress in 1974." See also Members of United States Congress. The AFL–CIO cited numerous opinion letters and court decisions for the conclusion that, whether or not an employer claims any tip credit, the employee must retain all tips (asserting the few court decisions that hold to the contrary are incorrect). Therefore, the AFL–CIO concluded that proposed § 531.52 would "turn the 1974 amendment on its head" by allowing employers to require employees to surrender their tips when the amendment bars such agreements; the commenter further stated that the proposal conflicts with proposed § 531.59, which states that section 3(m) requires employers to permit employees to retain all tips received with the exception of a valid, or bona fide, tip pool. Bruckner Burch commented that the final rule could incorporate examples from the Department's opinion letters, such as Wage Hour Opinion Letter WH–536, 1989 WL 610348 (Oct. 26 1989) (cited in the preamble), explaining when deductions may be made from the tips of employees who are paid in excess of the minimum wage, but that the rule as proposed created confusion.

The Chamber of Commerce stated that it supported the elimination of the references in current § 531.52 and other regulations to agreements between employers and employees that would make tips the property of the employer or require employees to turn over their

tips to employers. The commenter stated that "Congress amended the FLSA in 1974 to clarify that employers are not permitted to retain employee tips. References within the current regulations to agreements that could permit employers to do so were misleading and confusing, within the context of the congressional amendment."

The Department agrees with the analysis in the comments that tips are the property of the employee, and that Congress deliberately amended the FLSA's tip credit provisions in 1974 to clarify that section 3(m) provides the only permitted uses of an employee's tips—through a tip credit or for a valid tip pool among only those employees who customarily and regularly receive tips. This has been the Department's longstanding position since the 1974 amendments. The Department has also taken the position since the 1974 amendments that these protections against the use of an employee's tips apply irrespective of whether the employer has elected the tip credit.

The legislative history of the Act, as well as caselaw and opinion letters published shortly after the 1974 amendments, support the Department's position that section 3(m) provides the only permissible use of an employee's tips regardless of whether a tip credit is taken. As noted *supra*, the tip credit provision permitting an employer to use an employee's tips to satisfy 50 percent of the employer's minimum wage obligation was originally enacted in 1966. Public Law 89–601, § 101(a), 80 Stat. 830 (1966). In 1974, when the Act was amended, a Senate Report stated that the amendment was intended to "requir[e] that all tips received be paid out to tipped employees." S. Rep. No. 96–690, at 42 (1974). The same Report further observed that the amendments required employees to retain all of their tips (except to the extent that they are used in a valid tip pool) and clarified that an employer could not use its employees' tips to satisfy more than 50 percent of its minimum wage obligations. *Id.* at 42–43 (quoting 29 CFR 531.52). In 1977, a Senate Report from the Committee on Human Resources considering further amendments to the FLSA indicated that the role of tips in the calculation of an employer's minimum wage obligations to its tipped employees had been resolved by the 1974 amendments:

Tips are not wages, and under the 1974 amendments tips must be retained by the employees—which can include employees who are in an appropriate tip pool—and cannot be paid to the employer or otherwise used by the employer to offset his wage

obligation, except to the extent permitted by section 3(m).

S. Rep. No. 95–440, at 25 (1977). In support of this statement, the Report cites to two cases, *Richard v. Marriott Corp.,* 549 F.2d 303 (4th Cir. 1977), and *Usery v. Emersons Ltd.,* 1976 WL 1668 (E.D. Va. 1976), both of which recognized shortly after the 1974 amendments that while section 3(m) is not entirely clear, it had the effect of limiting an employer's use of its employees' tips to the extent provided in the statute. In *Marriott Corp.,* the Fourth Circuit concluded that tips belonged to the tipped employee, and that it was "nonsense" to argue after the 1974 amendments "that compliance with the statute results in one-half credit, but that defiance of the statute results in 100 percent credit." 549 F.2d at 305. In *Emersons Ltd.,* the district court stated that "[w]hile [section 3(m)] could have been worded more clearly, it is apparent, at least as a result of the 1974 amendment, that Congress intended to give the employer the benefits of tips received by the employee, but only to a limited extent." 1976 WL 1668, at *4.

The Ninth Circuit recently held that section 3(m)'s limitations on an employer's use of an employee's tips apply only when the tip credit is taken, and that when a tip credit is not taken, tips are only the property of the employee absent an agreement to the contrary. *Cumbie v. Woody Woo, Inc. d/b/a Vita Café,* 596 F.3d 577 (9th Cir. 2010); *see also Platek v. Duquesne Club,* 961 F. Supp. 835, 839 (W.D. Pa. 1995), *aff'd without opinion,* 107 F.3d 863 (3d Cir.) (Table), *cert. denied,* 522 U.S. 934 (1997). The Department respectfully believes that *Woody Woo* was incorrectly decided. The issue in *Woody Woo* was whether section 3(m)'s limitation on mandatory tip pools to those employees who "customarily and regularly" receive tips applies when an employer does not take a tip credit. In that case, tipped employees were required to turn over the majority of their tips to a tip pool that included employees, such as cooks and dishwashers, who are not "customarily and regularly" tipped employees, and received a small portion of their tips back from the tip pool. The employer was precluded from taking a tip credit by State law and paid its tipped employees the full State minimum wage, which exceeded the Federal minimum wage.

The Ninth Circuit started its analysis in *Woody Woo* with a statement from the 1942 Supreme Court decision in *Williams v. Jacksonville Terminal Co.,*

315 U.S. 386 (1942), that " '[i]n businesses where tipping is customary, the tips, *in the absence of an explicit contrary understanding,* belong to the recipient. Where, however, such an arrangement is made * * *, *in the absence of statutory interference, no reason is perceived for its invalidity.'"* *Woody Woo,* 596 F.3d at 579 (quoting *Jacksonville Terminal,* 315 U.S. at 397) (emphasis added by the Ninth Circuit). Thus, the Ninth Circuit stated that *Jacksonville Terminal* established a "default rule that an arrangement to turn over or to redistribute tips is presumptively valid," and that the question before the court was whether the FLSA, as amended, "imposes any 'statutory interference' that would invalidate Woo's tip-pooling arrangement." *Id.* After "unpacking" what it characterized as "dense statutory language" in section 3(m), the court concluded that it is "clear" that the current statutory language disrupts the *Jacksonville Terminal* default rule only when a tip credit is taken, because the language in the last sentence of section 3(m), providing that an employer cannot take a tip credit unless it has provided notice and permits employees to retain all of their tips (except for a valid tip pool), "imposes *conditions* on taking a tip credit and does not state freestanding *requirements* pertaining to all tipped employees." *Id.* at 581. The Ninth Circuit therefore did not read section 3(m) as imposing any limitations on the use of an employee's tips when a tip credit is not taken. The court thus rejected the Department's position in its *amicus curiae* brief that Woody Woo made improper deductions from the cash wage paid when it required its employees to contribute their tips to an invalid tip pool, and that this improper deduction resulted in a minimum wage violation because the tipped employees did not receive the full minimum wage plus all tips received.

The Department believes the Ninth Circuit incorrectly concluded that the 1974 amendments to the FLSA did not alter what it characterized as *Jacksonville Terminal*'s default rule. The fact that section 3(m) does not expressly address the use of an employee's tips when a tip credit is *not* taken leaves a "gap" in the statutory scheme, which the Department has reasonably filled through its longstanding interpretation of section 3(m). *See Barnhart v. Walton,* 535 U.S. 212, 218 (2002) ("[S]ilence, after all, normally creates ambiguity. It does not resolve it."); *see also Senger v. City of Aberdeen, SD,* 466 F.3d 670, 672 (8th Cir. 2006) (recognizing Department's

authority to fill a "gap" in the FLSA's regulatory scheme). The Ninth Circuit's "plain meaning" construction is unsupportable. Congress would not have had to legislatively permit employers to use their employees' tips to the extent authorized in section 3(m) unless tips were the property of the employee in the first instance. In other words, if tips were not the property of the employee, Congress would not have needed to specify that an employer is only permitted to use its employees' tips as a partial credit against its minimum wage obligations in certain prescribed circumstances because an employer would have been able to use all of its employees' tips for any reason it saw fit. If, as the Ninth Circuit held, the FLSA places limitations on an employer's use of its employees' tips only in the context of a tip credit, an employer could simply eschew the tip credit and use a greater part of its employees' tips toward its minimum wage obligations than permitted under section 3(m). This would stand the 1974 amendment "on its head" and would mean it has "accomplished nothing." *Emersons Ltd.*, 1976 WL 1668, at *4. If an employer could avail itself of this loophole, it would have no reason to ever elect the tip credit because, instead of using only a portion of its employees' tips to fulfill its minimum wage obligation, it could use all of its employees' tips to fulfill its entire minimum wage obligation to tipped employees or other employees. This is essentially what the panel's decision permits, because if there are no restrictions on an employer's use of its employees' tips when it does not utilize a tip credit, the employer can institute a mandatory tip pool that requires employees to contribute all of their tips regardless of how much they receive back, or mandate that employees turn over all of their tips and use those tips to pay the minimum wage or for any other purpose.

For example, if an employer is subject to the current Federal minimum wage of $7.25 an hour and its tipped employees receive $10 an hour in tips, an employer who uses the maximum tip credit against its minimum wage obligation has to pay a cash wage of $2.13 and can "use" $5.12 of an employee's tips as a credit toward the rest of the minimum wage payment. The employee thus receives $2.13 in cash wages and keeps all of her $10 in tips, for a total of $12.13. *Woody Woo*, however, permits an employer who eschews the tip credit to pay $7.25 to its tipped employees in cash wages to satisfy its minimum wage obligation and require an employee to turn over all $10 of the employee's tips.

The employee now receives only $7.25 an hour, rather than $12.13. And the employer, while it pays $7.25, gains $10.00 that it can direct for its own purposes (in essence realizing a $2.75 profit from the employee's tips). Thus, under the Ninth Circuit's "plain language" reading of section 3(m), an employer that does not utilize a tip credit is permitted to use its employee's tips to a greater extent than an employer that does utilize such credit. This yields an absurd result and makes the 1974 amendment superfluous.

As noted *supra*, the Department stated publicly immediately after the 1974 amendments that its tip credit regulations permitting employers to take control of employee tips through agreements were outdated, and indicated that new regulations were forthcoming. *See* Wage and Hour Opinion Letter WH–310, 1975 WL 40934, at *1 (Feb. 18, 1975). The Department also explicitly stated that the 1974 amendments superseded *Jacksonville Terminal*, explaining that "the situation of a tipped employee is far different" than it was in 1942. Wage and Hour Opinion Letter WH–321, 1975 WL 40945, at *1 (Apr. 30, 1975). As also noted *supra*, a number of commenters voiced concern that the proposed regulatory text in § 531.52 was confusing on this point, and did not make the Department's position clear. In order to codify its longstanding interpretation of section 3(m) in its regulations, and in response to these commenters, the Department is amending § 531.52 in the final rule to make clear that tips are the property of the employee, and that section 3(m) sets forth the only permitted uses of an employee's tips—either through a tip credit or a valid tip pool—whether or not the employer has elected the tip credit.

The inclusion of the text in proposed § 531.52 reading "Where an employee is being paid wages no more than the minimum wage" was intended to convey the fact that the Department only has authority under the FLSA to enforce, *inter alia*, the minimum wage provisions of that Act. *See, e.g.,* 29 U.S.C. 216, 217. Thus, if an employer pays the employee a direct wage in excess of the minimum wage—and thus did not claim a credit against any portion of the employee's tips and did not utilize the employee's tips in any way—the employer would be able to make deductions but only from the cash wage amount paid directly by the employer and only to the extent that the deductions did not reduce the employer's direct wage payment to an amount below the minimum wage. *See*

Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (Oct. 26, 1989). In such a situation, the deduction would be viewed as coming from the employer's direct wage payment that exceeds the minimum wage. This is consistent with the Department's position regarding impermissible deductions in the non-tip context. *See* Wage and Hour Opinion Letter FLSA 2006–21, 2006 WL 1910966 (June 9, 2006) (explaining that no FLSA action lies against an employer who makes impermissible deductions from cash wages paid if those wages are in excess of the minimum wage and the deductions do not reduce the employee's pay below the minimum wage). However, the Department agrees with the commenters that the payment of tipped employees under the FLSA and State laws is a very complex issue, and that retention of this language from the proposed rule could result in unintended confusion among the regulated community. Consequently, the text in proposed § 531.52 is revised to delete the introductory phrase in the fourth sentence of that section that reads: "Where an employee is being paid wages no more than the minimum wage," to clarify under the final rule that an employer in all cases is prohibited from using an employee's tips for any reason other than as a tip credit to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

ii. Required Employer Notice

Commenters representing employees also objected to the Department's proposal in § 531.59(b) and the accompanying preamble providing that employers only have to "inform" employees orally that they will treat tips as satisfying part of the employer's minimum wage obligation, but do not have to "explain" the tip credit or provide anything in writing. For example, NELP commented that the legislative history "makes clear that informing workers is no mere formality, but that the employer must indeed *explain* the tip credit." NELP quoted S. Rep. 93–690 at 43 (1974), which provides that the employer is responsible for informing a tipped employee how the wage was calculated and that "the employer must explain the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee." NELP stated that many tipped employees are low-wage and immigrant employees working in high-violation industries, and they do not understand the complicated tip credit rules. NELP suggested that requiring

employers to provide a clear written explanation to employees upon hire would help them understand the rules and would help employers because it "would enable them to protect themselves from litigation claiming that they failed to provide adequate notice and therefore cannot take the tip credit." *See also* North Carolina Justice Center, Greater Boston Legal Services (simply informing an employee that it will use the tip credit would be "jargon that would be meaningless to many workers, especially those with limited English proficiency or immigrant workers with limited experience with wages in this country * * * Having the explanation in writing, moreover, is especially important to those workers who may want or need to seek additional assistance, outside the workplace, to understand the information they are being provided."); Members of United States Congress (the regulation should require employers to explain the tip credit rules so that employees understand "how their wages are calculated, as a matter of fairness and as a way of enforcing the law * * * To satisfy these goals, the Department should require employers to provide written notice * * * Written notice will also prevent unnecessary litigation, by improving employees' understanding of their rights.").

The AFL–CIO submitted similar comments and stated that the proposed regulation "fails to satisfy the plain language of the statute, which requires not just that the employer 'inform' the employee that it is taking a tip credit, but that 'the employer [inform the employee] of the provisions of this subsection.'" NELA also submitted similar comments and stated that, given the increasing importance of employee tips vis-à-vis the minimum wage, the tip credit regulations should ensure the fair operation of the tip credit provisions.

Because the FLSA poster (Publication 1088) provides only a limited description of the tip credit rules and recognizes that "other conditions must also be met," several commenters suggested that the regulation should set forth a sample notice providing the required explanation in full. NELA, the AFL–CIO, and Bruckner Burch PLLC stated that employers must tell employees not only that the employer will be using the tip credit, but also that a minimum wage is required by law, the amount of the minimum wage, how the tip credit works—that the employer must pay $2.13 and the balance of the full minimum wage required by the Act can come from the tip credit but that the employer must make up the difference if the employee does not receive

sufficient tips, that the employee will retain all of his or her tips, and the formula for any tip pooling arrangement. These commenters stated that the Department should not rely on *Kilgore* v. *Outback Steakhouse of Florida, Inc.,* 160 F.3d 294 (6th Cir. 1998), the case cited in the preamble to the proposed rule, because it was wrongly decided on the notice issue in that it did not take into account the legislative history or the statutory language requiring employees to be informed of the provisions of section 3(m). These commenters pointed, instead, to other decisions that held employers could not utilize the tip credit where they had not adequately informed employees of the law's requirements. Finally, NELA objected to the suggestion that paychecks received after the work is performed or prior work history can provide the requisite notice, because the statute requires an employer to provide notice of the tip credit provisions prior to taking any tip credit.

Epstein Becker commented that the notice provision of section 3(m) does not require an employer to communicate its intent to use the tip credit; rather, it requires an employer to communicate the provisions of the section. Epstein Becker stated that the cases that require an employer to communicate its intent to treat tips as satisfying part of the minimum wage obligation do so without analysis of the statutory language and are incorrect. Epstein Becker further asserted that the information that would be useful to employees and required by section 3(m) is that the employer must supplement an employee's tips if they are insufficient to raise the wage level to the minimum wage, that the cash wage must be at least $2.13, and all tips earned must be retained by the employee absent a valid tip pooling arrangement (and perhaps information regarding the required information as to the tip pool, although this is "difficult to reconcile with the statute's language"). The commenter stated that the proposed regulation, requiring communication of the employer's intent to use the tip credit, does little to advance the purpose of the statute because virtually all employees know their employer intends to pay them a reduced tip wage based on prior work in the industry and any misunderstanding would be resolved with the first paycheck. Finally, Epstein Becker stated that the information on the FLSA poster (Publication 1088) is concise and understandable, and that the poster should contain all

information that employers are required to communicate.

The Chamber of Commerce and Littler Mendelson, P.C., agreed with the proposal regarding what an employer must communicate to employees and stated that it can be oral. They stated the proposal is a positive step in clarifying employer obligations and thus, it should reduce the litigation on this issue by clearly articulating the required content of the notice.

Section 3(m)(2) of the Act provides that the tip credit provisions "shall not apply with respect to any tipped employee unless *such* employee has been informed by the employer of the *provisions of this subsection,* and all tips received by such employee have been retained by such employee [except for] pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. 203(m)(2) (emphasis added). The "provisions of this subsection" include how to determine the wage an employer is required to pay a tipped employee, which is "the amount paid such employee by the employee's employer" (an amount that cannot be less than the cash wage required to be paid to a tipped employee on August 20, 1996, which was $2.13), and "the additional amount on account of the tips received by such employee" (an amount equal to the difference between the actual cash wage paid and the full minimum wage in effect under section 6(a)(1) of the Act). A Senate Report accompanying the 1974 amendments stated that the amendment "modifies Section 3(m) of the [FLSA] by requiring *employer explanation* to employees of the tip credit provisions, and by requiring that all tips received be paid out to tipped employees. * * * The tip credit provision of S. 2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer must explain the provision of the Act to the employee and that all tips received by such employee must be retained by the employee." S. Rep. No. 93–690 at 42–43 (1974) (emphasis added).

As discussed in the preamble to the proposed rule, the courts have disagreed over the level of notice required to "inform" a tipped employee about section 3(m). Thus, in *Kilgore* v. *Outback Steakhouse of Florida, Inc.,* 160 F.3d 294, 298 (6th Cir. 1998), the Sixth Circuit held that while an employer must "inform its employees of its intent to take a tip credit toward the

employer's minimum wage obligation," it was not required to "explain" the tip credit. In *Martin v. Tango's Restaurant, Inc.,* on the other hand, the First Circuit interpreted section 3(m)'s notice provision to require, "at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations," and stated that the provision "could easily be read to require more." 969 F.2d 1319, 1322 (1st Cir. 1992); *see Reich v. Chez Robert, Inc.,* 821 F. Supp. 967, 977 (D. N.J. 1993) (an employer does not meet its obligation to "inform" under section 3(m) when it tells its tipped employees that they will be paid a specific wage but does not explain that that wage is below the minimum wage and that it is permitted by law based on the employees' tips), *rev'd on other grounds,* 28 F.3d 401 (3d Cir. 1994)). In *Pellon v. Business Representation Int'l, Inc.,* 528 F. Supp. 2d 1306, 1310–11 (S.D. Fla. 2007), *aff'd,* 291 Fed. Appx. 310 (11th Cir. 2008), the district court held that the employer in that case had fulfilled its duty to "inform" its tipped employees of the provisions of section 3(m) by posting the FLSA poster and verbally notifying the employees that they would be paid $2.13 an hour plus tips, but noted that "a prominently displayed poster containing all of the relevant tip credit information" would also constitute sufficient notice. In *Bonham v. Copper Cellar Corp.,* 476 F. Supp. 98 (E.D. Tenn. 1979), on the other hand, the court held that vague references to the minimum wage and a poster that was not prominently displayed did not meet the requirement to "inform."

The Department has concluded that notice of the specific provisions of 3(m) is required to adequately inform the employee of the requirements of the tip credit. To the extent that the Sixth Circuit and other courts have reached different results, the Department notes that those courts generally failed to consider the important legislative developments underlying the FLSA's tip credit provisions and we choose to not be guided by those decisions in this revision of the regulations. Accordingly, based on the express provisions of the statute and the supporting legislative history, the Department agrees with the commenters stating that an employer must inform a tipped employee before it utilizes the tip credit, of the following: (1) The direct cash wage the employer is paying a tipped employee, which can be more than, but cannot be less than, $2.13 per hour; (2) the additional amount the employer is using as a credit

against tips received, which cannot exceed the difference between the minimum wage specified in section 6(a)(1) of the FLSA and the actual cash wage paid by the employer to the employee; (3) that the additional amount claimed by the employer on account of tips as the tip credit may not exceed the value of the tips actually received by the employee; (4) that the tip credit shall not apply with respect to any tipped employee unless the employee has been informed of the tip credit provisions of section 3(m) of the Act; and (5) that all tips received by the tipped employee must be retained by the employee except for the pooling of tips among employees who customarily and regularly receive tips. Furthermore, the current FLSA recordkeeping regulation, at 29 CFR 516.28(a)(3), expressly requires that the amount per hour that the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.

Upon careful reexamination of the terms of the statute, its legislative history, and a review of the public comments, the Department is revising its interpretation from the NPRM of the level of explanation that employers must provide when informing tipped employees about the tip credit pursuant to section 3(m). Accordingly, the text of the second and third sentences in proposed § 531.59(b) are combined and revised in the final rule to provide:

* * * Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, *i.e.:* The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section. * * *

Many commenters urged the Department to require employers to provide written notice to its tipped employees that explain section 3(m)'s tip credit provision. Although the Department is not requiring in this rule that the employer "inform" its tipped employees of section 3(m)'s requirements in writing, employers may wish to do so, since a physical document would, if the notice is

adequate, permit employers to document that they have met the requirements in section 3(m) and the Department's regulations to "inform" tipped employees of the tip credit provision. Finally, the Final Rule changes the word "bona fide" in the last sentence in proposed § 531.59(b) to "valid"; although both terms in this context refer to a tip pool that includes only those employees who customarily and regularly receive tips, the term "valid" is used in those regulations pertaining to tips for consistency.

### iii. Tip Pools

Commenters also addressed issues relating to tip pooling. As noted, the NPRM proposed to add two new sentences to § 531.54 ("Tip pooling") to explain that the FLSA does not set a maximum cap on the percentage of an employee's tips that may be contributed to a valid tip pool, but that an employer must notify its tipped employees of any required tip pool contribution amount. 73 FR 43667 (Jul. 28, 2008). UNITE HERE stated its belief that tip pooling must be voluntary, as indicated by current § 531.54 stating that an employer may redistribute tips to employees "upon some basis to which they have mutually agreed among themselves," and concluded that an employer should not be able to require employees to participate in a tip pool because the rules the employer created might not be fair. It particularly saw a mandatory pool as a concern if it actually involved mandatory tip splitting, because then the employer could reduce the tipped employee to the minimum wage and use the tips "to augment the cash compensation of other employees, thereby allowing the employer to reduce its own expenditures." It stated that the requirement that an employee retain all tips "would be swallowed up by the exception" in this situation. Therefore, UNITE HERE objected to the new language in § 531.54 referring to "any required tip pool contribution amount" and stated that employers should not be permitted to require tipping out or tip pooling. It also stated that where tip pooling is voluntary, there is no need for a percentage limitation and the common practice is for employees to contribute all tips. UNITE HERE further commented that, if the Department allows mandatory tip pooling, the regulations should ensure that the pool is valid or "bona fide" such as by clarifying that employers may not retain any of the tips, tips may only go to employees who regularly and customarily receive tips (not employees such as cooks, dishwashers and

janitors), and employers may only take credit for the amount each employee actually ultimately receives.

NELP objected to the proposed rule's statement that the FLSA does not impose a maximum contribution percentage on tip pools, stating that not having a cap "makes it easier for employers to skim tips for themselves." It suggested that the rule impose a "customary and reasonable" standard, which it concluded may reasonably be read into the FLSA. *See also* North Carolina Justice Center and AFL–CIO.

The Chamber of Commerce and Littler Mendelson, P.C. stated that they supported the elimination of the cap on "the amount employers could require tipped employees to 'tip out' to other tipped employees," noting that the rule requires an employer to notify employees of the amount they will be required to contribute to a tip pool. They stated that the tip credit rules ensure that employees will retain a sufficient proportion of their tips to satisfy minimum wage. Accordingly, Littler Mendelson, P.C., concluded that "no employee will be harmed in any way even if a higher percentage of their tips are contributed to a tip pool."

In response to the comments, the Department has modified the two proposed new sentences at the end of § 531.54 to read:

* * * Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips. However, an employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose.

Other aspects of tip pooling are discussed in the section on ownership of tips, *supra.*

### 8. Fair Labor Standards Act Amendments of 1977

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips. The proposed rule changed the references in 29 CFR 531.50(b), 531.51, 531.56(a)–(e), 531.57, and 531.58 from $20 to $30. The commenters did not specifically address these technical updates to conform to

the statute. Therefore, the final rule adopts the proposed changes to these regulations.

### 9. Meal Credit Under Section 3(m)

The NPRM proposed to amend § 531.30 to incorporate the Department's longstanding enforcement position regarding the acceptance of meals furnished as a credit towards the minimum wage. A "wage" paid pursuant to section 3(m) of the FLSA may include "the reasonable cost * * * to the employer of furnishing * * * board, lodging, or other facilities * * * customarily furnished by such employer to his employees." 29 U.S.C. 203(m). "Facilities" include employer-provided meals. *See* 29 CFR 531.32. The Department's regulation at 29 CFR 531.30, however, provides that an employer's ability to take credit for a facility is limited to those instances where an employee's acceptance was "voluntary and uncoerced." In other words, an employer could not take a wage credit for employees who did not choose to accept the meal.

After a number of courts rejected the agency's position on this point with regard to credit for meals, the agency adopted an enforcement position providing that an employer can take a meal credit even if an employee does not voluntarily accept the meal. *See* FOH section 30c09(b) ("WH no longer enforces the 'voluntary' provision with respect to meals."); *see also Davis Bros., Inc.* v. *Donovan,* 700 F.2d 1368, 1370 (11th Cir. 1983); *Donovan* v. *Miller Properties, Inc.,* 711 F.2d 49, 50 (5th Cir. 1983) (per curiam).

Thus, under the agency's current enforcement policy articulated in the FOH, an employer may require an employee to accept a meal provided by the employer as a condition of employment, and may take credit for no more than the actual cost of that meal even if the employee's acceptance is not voluntary. The NPRM proposed to amend 29 CFR 531.30 to reflect previous court decisions and the agency's current enforcement posture on meal credits.

Several commenters addressed this issue. Littler Mendelson, P.C., stated that it supported the proposal providing that an employee does not have to voluntarily accept a meal, stating that this was "not a change in the law" because it merely incorporates the Wage and Hour Division's current policy and court decisions into the regulations.

Commenters representing employees expressed a variety of views. The AFL–CIO stated that it opposed the change because it will make it easier for employers to deduct from workers' pay, "whether or not such meals are

adequate, and whether or not the employer is only deducting the reasonable cost of such meals." It also stated that it disadvantages employees who are unable to eat a meal because of dietary or health restrictions. Therefore, it concluded that the Department should issue guidance on the circumstances when an employer can claim a meal credit. NELP similarly stated that workers should not be required to pay for meals that they cannot eat. NELP stated that workers are not given an opportunity to eat a mid-shift meal, and yet an employer may automatically make a deduction for that meal. The meal provided may also consist of inferior ingredients or other dishes that cannot be offered for sale. *See also* North Carolina Justice Center. Comments by Members of United States Congress also stated that they opposed the change because "employees may not even be able to consume employer-provided meals, because of dietary restrictions associated with their health, religion, personal preference, or the lack of time to eat the meals." The SEIU recognized that the proposed change to reflect the court cases and the FOH policy was "unremarkable" and that whether an employee accepted a meal voluntarily had not been a pressing issue for 25 years. The SEIU commented that the real issue was employees not being given the time to eat the meal for which they were charged or given notice of how the cost of the meal is calculated. Therefore, the SEIU suggested that the regulation require that employers using a meal credit "maintain timekeeping records to indicate that the workers subject to the meal credit deduction actually had the time and opportunity to consume the meal" and that they must provide employees with written notice that the meal cost will be deducted and an explanation as to how the cost was calculated.

As explained *supra,* the former requirement that employee acceptance of a meal must be voluntary was rejected in the early 1980s by two courts of appeals. *Davis Bros.* v. *Donovan,* 700 F.2d 1368 (11th Cir. 1983); *Donovan* v. *Miller Properties, Inc.,* 711 F.2d 49 (5th Cir. 1983) (per curiam). The Department's enforcement position adopted after those rulings provided that where an employee is required to accept a meal as a condition of employment, the Department would take no enforcement action *provided* the employer takes credit for no more than the actual cost incurred. FOH 30c09(b). It should be noted that the employer in *Davis Bros.* deducted from employees'

wages no more than the actual or reasonable cost of the food provided, and allowed exceptions for employees who for medical reasons could not eat the food offered. There was no allegation of minimum wage violations based on the *amount* of the credit claimed, but simply that the employee's *acceptance* was made mandatory and not voluntary in contravention of § 531.30. 700 F.2d at 1369–70. The Eleventh Circuit failed to discern any basis for the Department's construction in section 3(m) of "customarily furnished" by the employer to mean "voluntarily accepted" by the employees. *Id.* at 1370. In the *Miller Properties* case, the Fifth Circuit affirmed a lower district court ruling in the employer's favor in a very brief decision that did not analyze the particular facts but simply stated it was affirming based on the reasoning of the Eleventh Circuit in *Davis Bros. Donovan v. Miller Properties, Inc.*, 711 F.2d at 50.

The proposed revisions to § 531.30 did not modify or otherwise excuse compliance with other applicable requirements that limit an employer's credit for the reasonable or actual costs to the employer of furnishing the employee with board, lodging, or other facilities (if customarily furnished) under Section 3(m) of the Act (*see* 29 CFR 531.3). Section 3(m) of the Act prescribes certain limitations and safeguards that control the payment of wages in other than cash or its equivalent. Special recordkeeping requirements must also be met as provided in 29 CFR part 516 (*see* § 516.27), the provisions of which also were not modified by the revisions proposed in the NPRM.

After careful consideration of the comments, the Department has determined that further study is warranted to assess the extent to which dietary or religious restrictions prevent employees from consuming employer-provided meals and whether adequate time is allowed for the employee to eat. The Department therefore is not adopting the proposal, but may provide guidance on this issue in the future.

10. Section 7(o) Compensatory Time Off

Section 7 of the FLSA requires that a covered employee receive compensation for hours worked in excess of 40 in a workweek at a rate not less than one and one-half times the regular rate of pay at which the employee is employed. 29 U.S.C. 207(a). In 1985, subsequent to the U.S. Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), which held that the FLSA may be constitutionally applied to State and

local governments, Congress added section 7(o), 29 U.S.C. 207(o), to the FLSA to permit public agencies (*i.e.*, States, local governments, and interstate agencies) to grant employees compensatory time off in lieu of cash overtime compensation pursuant to an agreement with the employees or their representatives. The purpose of this exception to the Act's usual requirement of cash overtime pay was "to provide flexibility to State and local government employers and an element of choice to their employees regarding compensation for statutory overtime hours." H.R. Rep. No. 99–331 (1985).

Section 7(o) provides a detailed scheme for the accrual and use of compensatory time off. Subsection 7(o)(1) authorizes the provision of compensatory time off in lieu of overtime pay. Subsection 7(o)(2) specifies how a public employer creates a compensatory time off plan. Subsection 7(o)(3) establishes limits for the amount of compensatory time off that an employee may accrue. Section 7(o)(4) provides the requirements for cashing out compensatory time upon an employee's termination. Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. 207(o)(5)(A), (B).

In 1987, after notice and comment, the Department issued final regulations implementing section 7(o) (29 CFR 553.20–.28). Section 553.25 of the regulations implements section 7(o)(5)'s requirements regarding the use of compensatory time off. Section 553.25(c) provides:

(1) Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.

(2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employers and the employee (or the representative of the

employee) reached prior to the performance of the work. (*See* § 553.23). To the extent that the [ ]conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in § 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period".

Section 553.25(d) states:

When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off. (*See* H. Rep. 99–331, p. 23.) For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

The Department has consistently interpreted its regulations as requiring that an employee's request for compensatory time on a specific date must be granted unless doing so would unduly disrupt the agency's operations. Wage and Hour Opinion Letter 1994 WL 1004861 (Aug. 19, 1994); *DeBraska v. City of Milwaukee*, 131 F. Supp. 2d 1032, 1034–35 (E.D. Wis. 2000) (deferring to the Department's interpretation of its regulations as requiring that the specific compensatory time requested must be granted absent undue disruption). As discussed in the NPRM, however, the Ninth Circuit in *Mortensen v. County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004), and the Fifth Circuit in *Houston Police Officers Union v. City of Houston*, 330 F.3d 298 (5th Cir.), *cert. denied*, 540 U.S. 879 (2003), both declined to defer to the Department's regulations because they found the plain language of section 7(o)(5)(B) to require only that an employee be allowed to use compensatory time within a "reasonable period" of the date requested for such leave unless doing so would "unduly disrupt" the agency. *Cf., Aiken v. City of Memphis*, 190 F.3d 753 (6th Cir. 1999), *cert. denied*, 528 U.S. 1157 (2000) (finding no FLSA violation where the city and the plaintiffs-police officers had agreed that "the reasonable period for requesting the use of banked compensatory time begins thirty days prior to the date in question and ends when the number of officers requesting the use of compensatory time on the given date would bring the precinct's staffing levels to the minimum level necessary for efficient operation").

Based on these appellate decisions, the NPRM proposed to revise section

553.25(c) to add a sentence that states that section 7(o)(5)(B) does not require a public agency to allow the use of compensatory time on the day specifically requested, but only requires that the agency permit the use of the time within a reasonable period after the employee makes the request unless the use would unduly disrupt the agency's operations. Additionally, the phrase "within a reasonable period after the request" was added to the final sentence of proposed § 553.25(d) and the phrase "during the time requested" was replaced with "during the time off" to clarify the employer's obligation.

Many commenters addressed the compensatory time off issue. NPELRA stated that it "wholeheartedly supports the proposed regulatory change." It commented that its member agencies have been so concerned about litigation regarding this issue that they have eliminated all FLSA compensatory time off, but that the proposed rules will ensure consistency throughout the country, thereby "reducing any incentives for public employers to eliminate FLSA compensatory time off, which benefits both employers and employees." NPELRA suggested that the Department revise § 553.25(d) to "state that the term 'unduly disrupt' may be defined in the collective bargaining process in the same manner as the term 'reasonable period' may be defined," stating that this would allow the parties to address circumstances unique to their particular organization and would result in less litigation. Finally, NPELRA commented that having to pay an employee overtime to fill in for an employee who is off creates an undue disruption and defeats the purpose of compensatory time off, as the *Mortensen* court found. Therefore, it suggested that the regulations specify that this is a factor an employer can consider in deciding whether to grant time off.

The IPMA–HR, IMLA, and NLC also commended the Department for the proposed change, stating that it would be "of great assistance to localities that must have adequate staff in order to provide services to citizens." They also urged the Department to provide that employers are not required to grant compensatory time off if it would mean that the employer would incur overtime expenses. Littler Mendelson, P.C., and SHRM also stated that they supported the proposed change, which appropriately conformed the regulation to the cited appellate court decisions.

Commenters representing employees strongly opposed the proposal. *See* American Federation of State, County and Municipal Employees (AFSCME), American Federation of Government

Employees (AFGE), International Union of Police Associations (I.U.P.A.), International Association of Fire Fighters, and AFL–CIO. AFSCME urged the Department to withdraw the proposal, stating that allowing an employer to deny an employee's requested day without demonstrating that it creates an undue hardship would "make a drastic change to the scope of the statute." AFSCME stated that there is no uniformity in the courts mandating the change, stating that a number of district court decisions have upheld the Department's current regulation. AFSCME also asserted that the Supreme Court's decision in *Christensen* v. *Harris County,* 529 U.S. 576, 583–85 (2000), provides additional support for the conclusion that an employer cannot deny the specific date requested for reasons other than those set forth in section 7(o)(5), because the Court stated that the section "imposes a restriction upon an employer's efforts to prohibit the use of compensatory time when employees request to do so." Therefore, AFSCME concluded "that, at best, there are conflicting interpretations of the language of the statute and the implementing regulation." *Id.* Because employees request specific dates for "milestones such as children's birthdays, family and friends' weddings, funerals, scheduled vacations and other date specific activities," it would harm employees to allow employers to deny the date requested absent undue disruption. Thus, absent consistent court interpretations, it stated it would be unwise public policy to change the regulation. *See also* AFGE (the current regulations "strike the proper balance between the public sector employer's interest in assuring that its mission is carried out and the employee's interest in being able to use compensatory time in a meaningful manner"); I.U.P.A. (the current rule appropriately balances agencies' needs and the interests of employees, while the proposal "would upset that balance, placing all of the burden on the employees, and allowing the employer to reap all the benefits"); and James D. Sewell ("When an officer or fireman needs to be off for a particular date, they need to be off that day, not a day the employer decides for them.").

The AFL–CIO made similar comments, stating that section 7(o)(5) is ambiguous and is best read as requiring an employer to act on an employee's request within a reasonable period after the request is made and to approve the specific day requested absent undue disruption. It noted that the Department had agreed with this interpretation in

the current regulation, an *amicus* brief and an opinion letter, and it disputed that there was unanimity even among the appellate courts compelling a change. It cited the decision in *Beck* v. *City of Cleveland,* 390 F.3d 912 (6th Cir. 2004), which it stated found "*Aiken* to have been effectively overruled by the Supreme Court's decision in *Christensen,*" and it emphasized that neither the Fifth Circuit (in *City of Houston*) nor the Ninth Circuit (in *Mortensen*) considered the Supreme Court's decision in reaching their conclusions. The AFL–CIO emphasized that the current regulation is consistent with the legislative history, citing Senate Report 99–159, which stated that when an employer receives a comp time request, "that request should be honored unless to do so would be unduly disruptive." It argued that the proposal "would render meaningless the 'unduly disrupt' language" because it would likely never come into play if an employer can simply substitute a date that it wants for the date the employee requested.

The I.U.P.A. also referred to the legislative history (House Report 99–331 (1985)), which states that compensatory time off "was intended to give 'freedom and flexibility' to public employees and 'additional options' to employers." The union therefore stated that the "reasonable period" is better read as referring to the time between the date the employees submit their requests and the dates requested for time off, so that "requests cannot provide such short notice that the employer would be scrambling to find a replacement." The I.U.P.A. commented that the rationale the Department offered for the change— that the courts uniformly interpreted the statutory language as unambiguous— does not hold up because several district courts have held that the statute is ambiguous and agreed with the Department's current regulation. It stated that if the Department's rationale is correct, then the regulations are unnecessary; it is only if the Department's rationale is incorrect, and a court agrees that the statute is ambiguous, that the regulations will have an impact because the court will defer to the regulations for assistance in interpreting the statute. Therefore, the I.U.P.A. stated that the proposal would place "responsibility squarely on the shoulders of the Department" because a court that found the statute ambiguous would defer to the regulation in denying police officers their chosen days off. *Id.*

Comments by Members of United States Congress also opposed the Department's proposal, stating that it "will undermine the ability of nearly 20

million public employees to use their accrued compensatory time off." They stated that the current rule is correct and consistent with the legislative history, and that the proposal upsets the careful balance that Congress struck. They also noted that only three of 13 courts of appeals have addressed this issue, and "just two of them have expressed disapproval of the Department's longstanding view." Moreover, they noted that a number of district courts have upheld the current rule so the "issue is unsettled in the federal courts."

The IAFF stated that the "proposal is nonsensical in that it essentially eviscerates the purposes for which comp time usage is requested." The IAFF noted that under the proposed rule an employer would have authority to deny a comp time request for no reason whatsoever, so long as some alternative date within a reasonable period were offered. It also stated that, in many fire departments, employees request time off weeks or months in advance, which aids departments in maintaining adequate staffing by allowing them time to fill vacancies. However, the IAFF stated that the proposal leads to an illogical conclusion, because the more lead time an employee provides, the less likely it is that the employee will receive statutory protection of the right to use the requested time off. The IAFF concluded that, as the Department acknowledged in the NPRM, some fire fighters will simply not accept compensatory time in lieu of cash if the proposal is adopted. "Such an outcome would depart from the plain Congressional intent in enacting this statutory provision. It also would likely impose a substantial financial burden on local government departments that rely on compensatory time, rather than cash overtime * * *"

Since the publication of the NPRM, another appellate court has addressed the issue of whether an employee's specific request to use compensatory time must be granted unless it unduly disrupts the agency's operation. In *Heitmann* v. *City of Chicago*, 560 F.3d 642 (7th Cir. 2009), the plaintiffs-police officers argued that the need to consider whether a request for leave created an "undue disruption" presupposed a particular time for the leave and that employees were therefore entitled to leave on the date and time of their choosing unless it would result in an undue disruption to the city. For its part, the city argued that it was required only to offer leave within a "reasonable time" of the employee's request for leave. The court noted that the city's position was supported by *Houston* and

*Mortensen,* while the plaintiffs' view was supported by *Beck* v. *Cleveland,* 390 F.3d 912 (6th Cir. 2004), and section 553.25 of the Department's regulations. The court rejected the Fifth and Ninth Circuit's plain language reading of 7(o)(5), stating that section 7(o)(5) "is anything but clear."

Words such as "reasonable" and "undue" are open-ended. They need elaboration, and the relation between these requirements needs explication. Here the agency has added vital details and its work prevails * * * unless it represents an implausible resolution.

560 F.3d at 646. The court found that the Department's interpretation of the requirements of section (7)(o)(5) in its regulations, which "makes compensatory leave more attractive to workers and hence a more adequate substitute for money," was reasonable and entitled to deference. *Id.* The court found that section 553.25(d) requires the employer to grant leave on the date and time requested unless doing so would create an undue disruption (in which case the employer would be able to defer the requested leave for a reasonable time). *Id.* at 647.

The Seventh Circuit's *Heitmann* decision, which finds support in the Sixth Circuit's decision in *Beck,* indicates that the appellate courts are not as uniform in their reading of section 7(o)(5) as the Department understood them to be at the time of the NPRM. The Department now views the courts of appeals as being split on the proper interpretation of 7(o)(5), with the Sixth and Seventh Circuits requiring agencies to grant the specific leave requested absent undue disruption, and the Fifth and Ninth Circuits requiring agencies to grant leave within a reasonable time of the leave requested unless doing so would create an undue disruption. The Department believes that the better reading of section 7(o)(5) is that it requires employers to grant compensatory time on the specific date requested unless doing so would unduly disrupt the agency. The statutory reading set forth in *Houston* and *Mortensen,* which requires that the employer grant compensatory time within a reasonable period of the date requested, essentially nullifies the "unduly disrupt" provision of 7(o)(5). *See Beck* v. *City of Cleveland,* 390 F.3d 912, 925 (6th Cir. 2005) ("to grant the City the unlimited discretion to deny compensatory leave requests relieves the city of establishing the undue disruption requirement imposed by Congress"); *DeBraska* v. *City of Milwaukee,* 131 F. Supp. 2d 1032, 1037 (E.D. Wis. 2000). Accordingly, in light of

the recent appellate decision, and in consideration of the extensive comments received on this section, the Department has decided not to finalize the proposed revision to section 553.25(c) and (d) and to leave the current regulation unchanged consistent with its longstanding position that employees are entitled to use compensatory time on the date requested absent undue disruption to the agency. In response to comments concerning whether the payment of overtime is a consideration in determining whether the use of compensatory time off is unduly disruptive, the Department does not believe that any regulatory change is warranted. The Department maintains its longstanding position that the fact that overtime may be required of one employee to permit another employee to use compensatory time off is not a sufficient reason for the employer to claim that the compensatory time off request is unduly disruptive. *See* Wage and Hour Opinion Letter 1994 WL 1004861 (Aug. 19, 1994); 52 FR 2012, 2017 (Jan. 16, 1987) ("The Department recognizes that situations may arise in which overtime may be required of one employee to permit another employee to use compensatory time off. However, such a situation, in and of itself, would not be sufficient for an employer to claim that it is unduly disruptive.").

11. Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114

The NPRM proposed to modify the Department's regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees to permit the payment of non-overtime bonuses and incentives without invalidating the guaranteed salary criterion required for the half-time overtime pay computation. The current regulation provides that an employer may use the fluctuating workweek method for computing half-time overtime compensation if an employee works fluctuating hours from week to week and receives, pursuant to an understanding with the employer, a fixed salary as straight-time compensation "(apart from overtime premiums)" for whatever hours the employee is called upon to work in a workweek, whether few or many. In such cases, an employer satisfies the overtime pay requirement of section 7(a) of the FLSA if it compensates the employee, in addition to the salary amount, at least one-half of the regular rate of pay for the hours worked in excess of 40 hours in each workweek.

Because the employee's hours of work fluctuate from week to week, the regular rate must be determined separately each week based on the number of hours actually worked each week.

Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees. The NPRM proposed that bona fide bonus or premium payments would not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8). The proposal also added an example to § 778.114(b) to illustrate these principles where an employer pays an employee a nightshift differential in addition to a fixed salary.

The Department's view, at that time, was that the proposed modification clarified the rule and was consistent with the Supreme Court's decision in *Overnight Transportation Co.* v. *Missel*, 316 U.S. 572 (1942), on which the existing regulation is patterned. *See* 73 FR 43662 (Jul. 28, 2008). The Department's proposed modification was intended to allow employers to pay additional bona fide premium payments.

The NPRM also proposed to increase the numerical values in the examples of overtime computations in § 778.114(b) so the rates of pay would be no less than the current minimum wage. Frank Dean commented that the term "approximately" in two places carried over from the current regulatory language is potentially misleading and confusing and should be eliminated to make it clear that the calculation of statutorily mandated overtime is exacting. Mr. Dean recommended changing one of the weekly hour totals from 44 to 37.5 so that there would be an exact regular rate calculation in each instance, thereby eliminating the need to use "approximately." We agree with this analysis and have incorporated his suggested revision into the final rule.

Wage and Hour Consulting Services commented that the statement limiting the weekly hours worked in the example to "never in excess of 50 hours in a workweek" in proposed § 778.114(b)(1) was confusing and redundant and should be deleted as unnecessary because it is clearly explained elsewhere in the section that the wage rate of an employee paid under the fluctuating workweek method cannot fall below the minimum wage. This phrase was carried over from the current regulation and we believe that it does not cause confusion and is needed

to establish in the example the concept that the employee's regular rate will not fall below the minimum wage. We have, therefore, retained the concept but have made minor wording changes to clarify the example.

Beyond these two minor editorial comments, the comments were sharply divided on the substance of the proposed revisions to the fluctuating workweek provisions. In general, commenters representing employers favored the revisions while commenters representing employees strongly opposed the revisions.

SHRM noted that it is common practice to pay a nonexempt salaried employee a bonus or premium as an incentive for various reasons, such as working less desirable hours. SHRM commented that other payment methods, such as hourly, piece rates, day rates, and job rates, contemplate that an employee may receive a bonus or other premium payments in addition to normal pay and asserted that it was logical and consistent to permit such payments under the fluctuating workweek method of compensation.

The Chamber of Commerce also favored the revisions but sought further clarifications as to when and how bonuses should be included in regular rate calculations, particularly when bonuses (1) cover more than one workweek, (2) are not paid in the same workweek when the work was performed to which the bonus applies, and (3) are not allocable among workweeks in proportion to the amount of bonus actually earned each week. Littler Mendelson, P.C., also supported the proposed revisions, but suggested further revisions to add cross-references to other sections in part 778 regarding how to include bonuses in the regular rate to clarify that all the rules regarding bonuses for nonexempt employees apply equally whether the nonexempt employee is paid by the hour, on a salary basis or under the fluctuating workweek method. Because we believe the principles for including bonuses in the regular rate discussed in other sections of the regulations are clear, we do not find that further clarifications or additional cross-references are necessary in this section.

Fisher & Phillips LLP noted that part 778 is an interpretative rule and similarly noted that § 778.114 "is simply one in a series of *examples* of how the regular-rate principles of Section 778.109 apply in different situations." The commenter recommended revisions to clarify that the half time overtime calculation in section 778.114 applies regardless of whether the employee's hours fluctuate. The Department

disagrees with this comment and notes that the application of section 778.114 is properly limited to situations where the employee's hours fluctuate. *See Flood* v. *New Hanover County*, 125 F.3d 249, 253 (4th Cir. 1997); FOH section 32b04b.

Comments expressing strong opposition to the proposed revisions were mostly based on two primary criticisms. First, that receipt of premium and bonus payments is inconsistent with payment of a fixed salary. *See* NELP, SEIU, NELA, AFL–CIO, Members of United States Congress, and North Carolina Justice Center. Second, that the proposed revisions will encourage employers to schedule additional overtime for employees paid under the fluctuating workweek method or otherwise disadvantage workers by expanding its use to a larger portion of the workforce. *See* NELP, North Carolina Justice Center, NELA, AFL–CIO, and Members of United States Congress. A number of these comments opposing the revisions questioned the Department's authority for making the revisions and asserted they would administratively overturn uniform, well-settled case law without justification and urged the Department to withdraw them. Commenters stating that premium and bonus payments are inconsistent with the concept of a fixed salary generally asserted that the proposed revisions are inconsistent with the Supreme Court's decision in *Missell*, in which the Court approved the use of the fluctuating workweek method requiring payment of only the additional half-time premium for hours worked over 40 per week for an employee paid a fixed weekly wage who worked weekly hours that fluctuated. Based on the Court's ruling and the language of current § 778.114(a), which provides that "[a]n employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many," these commenters asserted that employees paid under the fluctuating workweek method must receive fixed weekly pay that does not vary. The proposal departs from this fundamental concept, the commenters asserted. These commenters also took issue with the statement in the NPRM that the current regulation has presented challenges in the courts, asserting that courts applying the fluctuating workweek method of payment have uniformly concluded that

paying additional "non-overtime" premiums violates section 779.114. *See* NELA (citing *O'Brien* v. *Town of Agawam,* 350 F.3d 279 (1st Cir. 2003); *Dooley* v. *Liberty Mutual Ins. Co.,* 369 F. Supp. 2d 81 (D. Mass. 2005); *Ayers* v. *SGS Control Services, Inc.,* 2007 WL 646326 (S.D.N.Y. 2007)), SEIU, AFL–CIO, NELP, Members of United States Congress, and North Carolina Justice Center.

Several commenters also noted that the proposal would permit employers to reduce employees' fixed weekly salaries and shift the bulk of the employees' wages to bonus and premium pay. *See* NELP, NELA, SEIU, and North Carolina Justice Center. These commenters argued that this would harm employees because it would lead to significant variations in weekly wages based on the hours worked. They stated that such variations in pay are inconsistent with the purpose of the fluctuating workweek. They further objected to the proposal because it would expand the use of the fluctuating workweek method to industries in which bonus and premium payments are common. *See* NELA, Members of United States Congress, SEIU, and North Carolina Justice Center. Comments submitted by Members of the United States Congress urged that instead of modifying this section to expand its use, the Department should consider narrowing the scope of the section to prevent employers from abusing this method to lower workers' pay.

The Department has carefully considered all of the comments submitted on this section. While the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime pay under section 778.114. As several commenters noted, the proposed regulation could have had the unintended effect of permitting employers to pay a greatly reduced fixed salary and shift a large portion of employees' compensation into bonus and premium payments, potentially resulting in wide disparities in employees' weekly pay depending on the particular hours worked. It is just this type of wide disparity in weekly pay that the fluctuating workweek method was intended to avoid by requiring the payment of a fixed amount as straight time pay for all hours in the workweek, whether few or many. The basis for allowing the half-time overtime premium computation under the fluctuating workweek method is the mutual understanding between the employer and the employee regarding payment of a fixed amount as straight time pay for whatever hours are worked each workweek, regardless of their number. While the example provided in the NPRM of nightshift premiums resulted in a relatively modest change in the employee's straight time pay, the Department now believes that the proposed regulation would have been inconsistent with the requirement of a fixed salary amount set forth by the Supreme Court in *Overnight Motor Transport* v. *Missel.* Moreover, on closer examination, the Department is persuaded that the courts have not been unduly challenged in applying the current regulation to additional bonus and premium payments. *See O'Brien* v. *Town of Agawam,* 350 F.3d 279 (1st Cir. 2003); *Adeva* v. *Intertek USA,* 2010 WL 97991 (D.N.J. 2010); *Dooley* v. *Liberty Mutual Ins. Co.,* 369 F. Supp. 2d 81 (D. Mass. 2005); *Ayers* v. *SGS Control Services, Inc.,* 2007 WL 646326 (S.D.N.Y. 2007).

Finally, while the proper use of the fluctuating workweek method of pay results in an employee being paid time and one-half of the employee's regular rate for overtime hours, the Department is cognizant that this method of pay results in a regular rate that diminishes as the workweek increases, which may create an incentive to require employees to work long hours. The Department does not believe that it would be appropriate to expand the use of this method of computing overtime pay beyond the scope of the current regulation. Accordingly, the final rule has been modified from the proposal to restore the current rule requiring payment of the fixed salary amount as the straight time pay for whatever hours are worked in the workweek, that a clear mutual understanding of the parties must exist that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek whatever their number, that the fixed salary amount must be sufficient to provide compensation at a rate not less than the minimum wage, and that the employee must receive extra compensation in addition to the fixed salary for all overtime hours worked at a rate not less than one-half the regular rate of pay. Editorial revisions have been included in the text of the final rule to delete gender-specific references and to update the computation examples to provide wage rates above the minimum wage and the exact calculation of the regular rate. The proposed examples in the NPRM at § 778.114(b)(2) suggesting methods for making supplemental nightshift premium payments as part of the fluctuating workweek methodology for computing half-time overtime pay have been deleted from the final rule.

## Other Revisions

The current recordkeeping regulations on tipped employees at 29 CFR 516.28 include an outdated parenthetical reference that suggests a limit "(not in excess of 40 percent of the applicable statutory minimum wage)" as the maximum amount of tip credit an employer may claim under the FLSA. 29 CFR 516.28(a)(3). This outdated reference reflected the former provisions of section 3(m) of the FLSA as amended by the 1977 FLSA Amendments, which has since been overtaken by subsequent statutory amendments passed in 1989 and 1996. *See* Public Law 95–151, § 3(b)(2), 91 Stat. 1249 (Nov. 1, 1977); Public Law 101–157, § 5, 103 Stat. 941 (Nov. 17, 1989); Public Law 104–188, § 2105(b), 110 Stat. 1929 (Aug. 20, 1996). The Department inadvertently overlooked updating this reference in part 516 when updating the other tip credit references in the NPRM. Because the regulatory reference has been superseded by subsequent statutory enactments, the Department is updating this section of the recordkeeping regulation in this final rule to conform it to current law and, because of the technical nature of the change, is doing so without prior notice and opportunity for public comment. The Department hereby finds, pursuant to the Administrative Procedure Act, that prior notice and opportunity for public comment on this ministerial change that is required by statutory amendment are impracticable, unnecessary, or contrary to the public interest. *See* 5 U.S.C. 553(b)(3)(B).

The current interpretative regulation on "Hours Worked," at 29 CFR 785.7 ("Judicial construction"), cites incorrectly to a holding of the U.S. Supreme Court in *Tennessee Coal, Iron & Railroad Co.* v. *Muscoda Local No. 123,* 321 U.S. 590, 598 (1944). The typographical error in the phrase "primarily for the benefit of the employer *of* his business" is corrected by replacing the incorrect "of" with "and." Because this change is required to conform the text to the cited holding, the Department is making this correction without prior notice and opportunity for public comment. The Department hereby finds, pursuant to the Administrative Procedure Act, that prior notice and opportunity for public comment on this ministerial change are

impracticable, unnecessary, or contrary to the public interest. *See* 5 U.S.C. 553(b)(3)(B).

## IV. Paperwork Reduction Act

This rule does not impose new information collection requirements for purposes of the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*

## V. Executive Orders 12866 and 13563; Small Business Regulatory Enforcement Fairness Act; Regulatory Flexibility

This final rule is not economically significant within the meaning of Executive Order 12866, or a "major rule" under the Unfunded Mandates Reform Act or Section 801 of the Small Business Regulatory Enforcement Fairness Act.

As discussed previously in this preamble, over the years, Congress has amended the FLSA to refine or to add to exemptions and to clarify the minimum wage and overtime pay requirements. However, in many cases, the Department of Labor did not update the FLSA regulations to reflect these statutory changes. The Department believes that the existing outdated regulatory provisions may cause confusion within the regulated community resulting in inadvertent violations and the costs of corrective compliance measures to remedy them.

The Department has determined that the final rule changes will not result in any additional compliance costs for regulated entities because the current compliance obligations derive from current law and not the outdated regulatory provisions that have been superseded years ago.

The Department is aware that this interpretation appears to be inconsistent with OMB Circular A–4's guidance on the use of analysis baselines, which states: "In some cases, substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action. In these cases, you should use a pre-statute baseline" to conduct the regulatory impact analysis. However, as the discussion below indicates, the Department believes the use of a pre-statute baseline would be extremely difficult for statutes enacted a decade or more in the past. Fundamental changes in the economy and labor market (*e.g.,* the introduction of technology, changes in the size and composition of the labor force, changes in the economy that impact the demand for labor, *etc.*) would make it difficult, if not impossible, to separate those changes from changes that resulted from enactment of the statute.

Moreover, the Department believes the economic impacts due to the statutory changes to the FLSA are typically greatest in the short run and diminish over time. This is due to labor markets determining the most efficient way to adjust to the new requirements, and because the Department believes many of the changes mandated by various revisions to the FLSA are reflective of the natural evolution of the labor market and would have become more common even in the absence of regulatory changes. For example, as nominal wages rise overtime, the marginal impact of a fixed minimum wage provision decreases, since it is less binding on the market. Therefore, the impacts resulting from the promulgation of the final regulations are not likely to be measurable. In fact, the Department anticipates that this final rule will simply enhance the Department's enforcement of, and the public's understanding of, compliance obligations under the FLSA by replacing outdated regulations with updated provisions that reflect current law.

*1996 and 2007 Amendments to the FLSA Minimum Wage*

The current FLSA regulations reference the minimum wage in several places, some referring to the 1981 minimum wage of $3.35 and others referring to the 1991 minimum wage of $4.25. To eliminate the current inconsistencies between the FLSA regulations and the statute, the Department revised the regulations to refer to the statutory minimum wage provision rather than a specific minimum wage. Since the final regulations do not include any reference to a specific minimum wage, the Department believes they do not impose the burden of increasing the minimum wage from the levels specified in the current regulations. That burden was imposed by the statutory changes and is not derived from the FLSA regulations. Thus, the Department concludes that the only incremental effect of this final rule on the public from these changes is possibly clearing up some confusion. This differentiates the minimum wage provisions from many other rulemakings in which the Department is given little statutory discretion, but nonetheless is still required to update the CFR.

*Small Business Job Protection Act of 1996*

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a), to state that for travel time involving the employee's use of employer-provided vehicles for commuting at the beginning and end of the workday to be considered noncompensable, the use of the vehicle must be "conducted under an agreement between the employer and the employee or the employee's representative." The Department believes that since 1996 the labor market has adjusted to this statutory change and that it would be very difficult, if not impossible, to estimate the impact of this amendment. It is likely that as part of their overall compensation package, some employers and their employees have agreed to make the travel time compensable while others have agreed to make it noncompensable. In addition, since this provision simply clarifies that compensability should be subject to an agreement, but does not otherwise restrict the type of agreement employers and employees may reach, the Department believes this provision by its nature does not impose a significant burden on the public. Therefore, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

In addition, section 2105 of the SBJPA amended the FLSA effective August 20, 1996, by adding section 6(g), 29 U.S.C. 206(g), which provides that "[a]ny employer may pay any employee [who has not attained the age of 20] of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour." The Department believes that the labor market has also adjusted to this change during the period since the enactment of the SBJPA. Although youths would obviously want to receive the normal minimum wage rather than the youth wage, some youths will decide to accept the lower youth wage in order to gain experience in the labor market. Similarly, although some employers may want to pay the lower youth wage, some may find compliance with the added requirements associated with the youth wage not to be worth the savings in wages. Thus, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

*Agricultural Workers on Water Storage/ Irrigation Projects*

Public Law 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), by extending the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects where at least 90

percent of the water is used for agricultural purposes, rather than where the water is used exclusively for agricultural purposes. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. Although agricultural workers and workers employed on water storage/irrigation projects listed in the exemption are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees will choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary with no additional compensation for the hours worked in excess of 40 in a week. In addition, this provision applies to a relatively small part of the overall U.S. labor force; thus, the Department believes any possible impacts due to this exemption would likely not be substantial. Therefore, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

### Certain Volunteers at Private Non-Profit Food Banks

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at private non-profit food banks and who receive groceries from those food banks. 29 U.S.C. 203(e)(5). The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. The Department also believes this regulatory change is not likely to cause an impact we would consider significant, since its application is limited and it simply clarifies that certain individuals may be considered volunteers.

### Employees Engaged in Fire Protection Activities

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This change in definition impacts fire protection employees who may be covered by the partial overtime exemption allowed by § 7(k) (29 U.S.C. 207(k)) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20) (29 U.S.C. 213(b)(20)). The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the market has adjusted to this change during the period since the enactment of the amendment. Thus, the Department concludes that the final regulatory changes will have no measurable effect on the public except to possibly clear up some confusion by replacing outdated regulations with updated provisions to reflect current law.

### Stock Options Excluded From the Computation of the Regular Rate

The Worker Economic Opportunity Act enacted by Congress on May 18, 2000, amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria to the types of remuneration that are excluded from the computation of the regular rate. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7. The Department believes that the labor markets have adjusted to this statute, which provides additional alternatives for employee compensation, but does not otherwise limit or mandate the overall levels of compensation owed to any category of worker. The final regulatory changes merely help to correct any confusion in this area.

### Fair Labor Standards Act Amendments of 1974 and 1977

On April 7, 1974, Congress enacted an amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10). Public Law 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the labor market has also adjusted to this change during the long period since the enactment of the amendment. Although salespersons primarily engaged in selling boats are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees may choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary and commissions with no additional compensation for the hours worked in excess of 40 in a week.

Similarly, the Department believes that the market has adjusted to no exemptions for partsmen and mechanics servicing trailers or aircraft. Although there may have been some short run effects related to the statutory change, in the years since enactment of the statute, employers and their employees have adjusted to the overtime requirement. Thus, the Department concludes that the final regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." The amendment changed the conditions for taking the tip credit when making wage payments to qualifying tipped employees under the FLSA. Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips. Although the mandatory paid wage ($2.13) for tipped employees is below the full minimum wage, these workers must still receive hourly compensation (cash wages plus tips) at least equal to the minimum wage. Moreover, regardless of the minimum wage, if the hourly compensation is too low employers will have trouble finding a sufficient number of workers. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment and that the regulatory changes will have no measurable economic effect on the public except to possibly clear up some confusion.

### Meal Credit Under Section 3(m)

The Department proposed to amend § 531.30 to reflect that, with the exception of meals, the employee's acceptance of a facility for which the employer seeks to take a 3(m) credit must be voluntary and uncoerced. The Department determined that the

proposed change would have no measurable economic impact. After consideration of the comments received, the Department has determined that further study of this issue is warranted, and therefore is not adopting the proposal. Because the Department is not implementing this proposal, there is no change to the status quo. As a result, the Department does not believe that there will be any measurable economic impact on the public.

*Section 7(o) Compensatory Time Off*

In 1987, the Department issued final regulations implementing a detailed scheme for the accrual and use of compensatory time off under Section 7(o). 29 U.S.C. 207(o). Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

> An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. 207(o)(5). As discussed supra, the Department proposed to amend § 553.25(c) to comport with appellate court decisions reading the statutory language to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time unless doing so would be unduly disruptive. Additionally, the Department proposed to clarify the employer's obligation when denying an employee's request for the use of compensatory time off in § 553.25(d).

In the NPRM, the Department stated its belief that the proposed changes would eliminate some of the confusion over the use of compensatory time off. The Department stated that it did not believe the proposed changes altered the nature of compensatory time off rights and responsibilities, but recognized that because of uncertainty as to their ability to use compensatory time when requested, some employees might choose not to accrue compensatory time off, thus resulting in some slight economic impacts.

As already discussed in this preamble, since the publication of the NPRM, another appellate court has addressed this issue and concluded that the statutory language is unclear and that the Department's regulations requiring an employer to grant the specific time requested unless it would unduly disrupt the agency's operations is reasonable. The Department has therefore reexamined its proposal based on all the appellate decisions and the public comments and has decided not to finalize the proposed revision to section 553.25(c) and (d) and to leave the current regulation unchanged consistent with its longstanding position that employees are entitled to use compensatory time on the date requested absent undue disruption to the agency. Because the proposed changes will not be implemented, the Department does not believe that there will be any measurable economic impact on the public.

*Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114*

The Department proposed to modify the regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees. The proposed regulation provided that bona fide bonus or premium payments would not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8). Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for both employers and their employees.

For the reasons discussed earlier in this preamble, while the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114. Therefore the final rule does not implement this proposed provision. Because the proposed changes will not be implemented, the Department does not believe that there will be any measurable economic impact on the public.

1. Executive Orders 12866 and 13563 (Regulatory Review)

The Department does not believe that incorporating these statutory amendments into the FLSA and Portal Act regulations will impose measurable costs on private or public sector entities. The final rule changes should not result in additional compliance costs for regulated entities because employers have been obligated to comply with the underlying statutory provisions for many years. With this action, DOL is merely bringing up-to-date regulatory provisions that were superseded years ago.

2. Regulatory Flexibility Act

Furthermore, because the final rule will not impose any measurable costs on employers, both large and small entities, the Department has determined that it would not have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). The Department certified to the Chief Counsel for Advocacy to this effect at the time the NPRM was published. The Department received no contrary comments that questioned the Department's analysis or conclusions in this regard. Consequently, the Department certifies once again pursuant to 5 U.S.C. 604 that the revisions being implemented in connection with promulgating this final rule will not have a significant economic impact on a substantial number of small entities. Accordingly, the Department need not prepare a regulatory flexibility analysis.

**VI. Unfunded Mandates Reform Act**

This final rule has been reviewed in accordance with the Unfunded Mandates Reform Act of 1995 (UMRA). 2 U.S.C. 1501 *et seq.* For the purposes of the UMRA, this rule does not impose any Federal mandate that may result in increased expenditures by State, local, or Tribal governments, or increased expenditures by the private sector, of more than $100 million in any year.

**VII. Executive Order 13132 (Federalism)**

The Department has reviewed this rule in accordance with the Executive Order on Federalism (Executive Order 13132, 64 FR 43255, Aug. 10, 1999). This rule does not have federalism implications as outlined in E.O. 13132. The rule does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

**VIII. Executive Order 13175, Indian Tribal Governments**

The Department has reviewed this rule under the terms of Executive Order 13175 and determined it did not have "tribal implications." The rule does not have "substantial direct effects on one or more Indian tribes, on the relationship

between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes." As a result, no Tribal summary impact statement has been prepared.

### IX. Effects on Families

The Department certifies that this rule will not adversely affect the well-being of families, as discussed under section 654 of the Treasury and General Government Appropriations Act, 1999.

### X. Executive Order 13045, Protection of Children

The Department has reviewed this rule under the terms of Executive Order 13045 and determined this action is not subject to E.O. 13045 because it is not economically significant as defined in E.O. 12866 and it does not impact the environmental health or safety risks of children.

### XI. Environmental Impact Assessment

The Department has reviewed this rule in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, the regulations of the Council of Environmental Quality, 40 CFR 1500 *et seq.*, and the Departmental NEPA procedures, 29 CFR part 11, and determined that this rule will not have a significant impact on the quality of the human environment. There is, thus, no corresponding environmental assessment or an environmental impact statement.

### XII. Executive Order 13211, Energy Supply

The Department has determined that this rule is not subject to Executive Order 13211. It will not have a significant adverse effect on the supply, distribution or use of energy.

### XIII. Executive Order 12630, Constitutionally Protected Property Rights

The Department has determined that this rule is not subject to Executive Order 12630 because it does not involve implementation of a policy "that has taking implications" or that could impose limitations on private property use.

### XIV. Executive Order 12988, Civil Justice Reform Analysis

The Department drafted and reviewed this final rule in accordance with Executive Order 12988 and determined that the rule will not unduly burden the Federal court system. The rule was: (1) Reviewed to eliminate drafting errors

and ambiguities; (2) written to minimize litigation; and (3) written to provide a clear legal standard for affected conduct and to promote burden reduction.

### List of Subjects

#### 29 CFR Part 4

Administrative practice and procedures, Employee benefit plans, Government contracts, Labor, Law enforcement, Minimum wages, Penalties, Wages.

#### 29 CFR Part 516

Employment, Recordkeeping, Law enforcement, Labor.

#### 29 CFR Part 531

Employment, Labor, Minimum wages, Wages.

#### 29 CFR Part 553

Firefighters, Labor, Law enforcement officers, Overtime pay, Wages.

#### 29 CFR Part 778

Employment, Overtime pay, Wages.

#### 29 CFR Part 779

Compensation, Overtime pay.

#### 29 CFR Part 780

Agriculture, Irrigation, Overtime pay.

#### 29 CFR Part 785

Compensation, Hours of work.

#### 29 CFR Part 786

Compensation, Minimum wages, Overtime pay.

#### 29 CFR Part 790

Compensation, Hours of work.

Signed at Washington, DC, this 16th day of March 2011.

**Nancy J. Leppink,**

*Acting Administrator, Wage and Hour Division.*

For the reasons set forth above, the Department amends Title 29, Parts 4, 516, 531, 553, 778, 779, 780, 785, 786, and 790 of the Code of Federal Regulations as follows:

### PART 4—LABOR STANDARDS FOR FEDERAL SERVICE CONTRACTS

■ 1. The authority citation for part 4 is revised to read as follows:

**Authority:** 41 U.S.C. 351 *et seq.;* 41 U.S.C. 38 and 39; 5 U.S.C. 301; Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112; Secretary's Order 9–2009, 74 FR 58836 (Nov. 13, 2009).

#### § 4.159    General minimum wage. [Amended]

■ 2. Amend § 4.159 by removing the last sentence.

■ 3. Amend § 4.167 by revising the twelfth sentence to the end, to read as follows:

#### § 4.167    Wage payments—medium of payment.

* * * The general rule under that Act provides, when determining the wage an employer is required to pay a tipped employee, the maximum allowable hourly tip credit is limited to the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of that Act. (*See* § 4.163(k) for exceptions in section 4(c) situations.) In no event shall the sum credited as tips exceed the value of tips actually received by the employee. The tip credit is not available to an employer unless the employer has informed the employee of the tip credit provisions and all tips received by the employee have been retained by the employee (other than as part of a valid tip pooling arrangement among employees who customarily and regularly receive tips; *see* section 3(m) of the Fair Labor Standards Act).

### PART 516—RECORDS TO BE KEPT BY EMPLOYERS

■ 4. The authority citation for part 516 is revised to read as follows:

**Authority:** Sec. 11, 52 Stat. 1066, as amended, 29 U.S.C. 211. Section 516.28 also issued under Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112. Section 516.33 also issued under 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.* Section 516.34 also issued under Sec. 7, 103 Stat. 944, 29 U.S.C. 207(q).

■ 5. Amend § 516.28 by revising the first sentence of paragraph (a)(3) to read as follows:

#### § 516.28    Tipped employees.

(a) * * *

(3) Amount by which the wages of each tipped employee have been deemed to be increased by tips as determined by the employer (not in excess of the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of the Act).

* * * * *

### PART 531—WAGE PAYMENTS UNDER THE FAIR LABOR STANDARDS ACT OF 1938

■ 6. The authority citation for part 531 is revised to read as follows:

**Authority:** Sec. 3(m), 52 Stat. 1060; sec. 2, 75 Stat. 65; sec. 101, 80 Stat. 830; sec. 29(B), 88 Stat. 55, Pub. L. 93–259; Pub. L. 95–151, 29 U.S.C. 203(m) and (t); Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112.

## § 531.7   [Removed and Reserved]

■ 7. Remove and reserve § 531.7.

■ 8. Amend § 531.36 by revising paragraph (a) to read as follows:

### § 531.36   Nonovertime workweeks.

(a) When no overtime is worked by the employees, section 3(m) and this part apply only to the applicable minimum wage for all hours worked. To illustrate, where an employee works 40 hours a week at a cash wage rate of at least the applicable minimum wage and is paid that amount free and clear at the end of the workweek, and in addition is furnished facilities, no consideration need be given to the question of whether such facilities meet the requirements of section 3(m) and this part, since the employee has received in cash the applicable minimum wage for all hours worked. Similarly, where an employee is employed at a rate in excess of the applicable minimum wage and during a particular workweek works 40 hours for which the employee receives at least the minimum wage free and clear, the employer having deducted from wages for facilities furnished, whether such deduction meets the requirement of section 3(m) and subpart B of this part need not be considered, since the employee is still receiving, after the deduction has been made, a cash wage of at least the minimum wage for each hour worked. Deductions for board, lodging, or other facilities may be made in nonovertime workweeks even if they reduce the cash wage below the minimum wage, provided the prices charged do not exceed the "reasonable cost" of such facilities. When such items are furnished the employee at a profit, the deductions from wages in weeks in which no overtime is worked are considered to be illegal only to the extent that the profit reduces the wage (which includes the "reasonable cost" of the facilities) below the required minimum wage. Facilities must be measured by the requirements of section 3(m) and this part to determine if the employee has received the applicable minimum wage in cash or in facilities which may be legitimately included in "wages" payable under the Act.

\*      \*      \*      \*      \*

■ 9. Revise § 531.37 to read as follows:

### § 531.37   Overtime workweeks.

(a) Section 7 requires that the employee receive compensation for overtime hours at "a rate of not less than one and one-half times the regular rate at which he is employed." When overtime is worked by an employee who receives the whole or part of his or her wage in facilities and it becomes

necessary to determine the portion of wages represented by facilities, all such facilities must be measured by the requirements of section 3(m) and subpart B of this part. It is the Administrator's opinion that deductions may be made, however, on the same basis in an overtime workweek as in nonovertime workweeks (*see* § 531.36), if their purpose and effect are not to evade the overtime requirements of the Act or other law, providing the amount deducted does not exceed the amount which could be deducted if the employee had only worked the maximum number of straight-time hours during the workweek. Deductions in excess of this amount for such articles as tools or other articles which are not "facilities" within the meaning of the Act are illegal in overtime workweeks as well as in nonovertime workweeks. There is no limit on the amount which may be deducted for "board, lodging, or other facilities" in overtime workweeks (as in workweeks when no overtime is worked), provided that these deductions are made only for the "reasonable cost" of the items furnished. These principles assume a situation where bona fide deductions are made for particular items in accordance with the agreement or understanding of the parties. If the situation is solely one of refusal or failure to pay the full amount of wages required by section 7, these principles have no application. Deductions made only in overtime workweeks, or increases in the prices charged for articles or services during overtime workweeks will be scrutinized to determine whether they are manipulations to evade the overtime requirements of the Act.

(b) Where deductions are made from the stipulated wage of an employee, the regular rate of pay is arrived at on the basis of the stipulated wage before any deductions have been made. Where board, lodging, or other facilities are customarily furnished as additions to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay. *See Walling* v. *Alaska Pacific Consolidated Mining Co.,* 152 F.2d 812 (9th Cir. 1945), *cert. denied,* 327 U.S. 803.

■ 10. Remove the undesignated center heading above § 531.50.

■ 11. Designate §§ 531.50 through 531.60 as subpart D, and add a heading for subpart D to read as follows:

## Subpart D—Tipped Employees

■ 12. Revise § 531.50 to read as follows:

### § 531.50   Statutory provisions with respect to tipped employees.

(a) With respect to tipped employees, section 3(m) provides that, in determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996 [*i.e.,* $2.13]; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

(b) "Tipped employee" is defined in section 3(t) of the Act as follows: *Tipped employee* means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

### §§ 531.51, 531.56, 531.57, 531.58 [Amended]

■ 13. In addition to the amendments set forth above, in 29 CFR part 531, remove the words "$20" and add, in their place, the words "$30" wherever they appear in the following places:

■ a. Section 531.51;

■ b. Section 531.56, the section heading and paragraphs (a) through (e);

■ c. Section 531.57; and

■ d. Section 531.58.

■ 14. Amend § 531.52 by revising the second sentence to the end of the paragraph to read as follows:

### § 531.52   General characteristics of "tips."

\* \* \* Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity. Tips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA. The employer is prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason other than that which is statutorily permitted in section 3(m): As a credit against its minimum wage obligations to the employee, or in furtherance of a valid tip pool. Only tips actually received by an employee as money belonging to the employee may be counted in determining whether the person is a "tipped employee" within the meaning of the Act and in applying the provisions of section 3(m) which govern wage credits for tips.

■ 15. Amend § 531.54 by adding two sentences to the end of the paragraph to read as follows:

### § 531.54   Tip pooling.

* * * Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips. However, an employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose.

■ 16. Revise § 531.55 to read as follows:

### § 531.55   Examples of amounts not received as tips.

(a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t). Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.

(b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

■ 17. Amend § 531.56 by revising the last sentence in paragraph (d) to read as follows:

### § 531.56   "More than $30 per month in tips."

*     *     *     *     *

(d) * * * It does not govern or limit the determination of the appropriate amount of wage credit under section 3(m) that may be taken for tips under section 6(a)(1) (tip credit equals the difference between the minimum wage required by section 6(a)(1) and $2.13 per hour).

*     *     *     *     *

■ 18. Revise § 531.59 to read as follows:

### § 531.59   The tip wage credit.

(a) In determining compliance with the wage payment requirements of the Act, under the provisions of section 3(m) the amount paid to a tipped employee by an employer is increased on account of tips by an amount equal to the formula set forth in the statute (minimum wage required by section 6(a)(1) of the Act minus $2.13), provided that the employer satisfies all the requirements of section 3(m). This tip credit is in addition to any credit for board, lodging, or other facilities which may be allowable under section 3(m).

(b) As indicated in § 531.51, the tip credit may be taken only for hours worked by the employee in an occupation in which the employee qualifies as a "tipped employee." Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, i.e.: The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section. The credit allowed on account of tips may be less than that permitted by statute (minimum wage required by section 6(a)(1) minus $2.13); it cannot be more. In order for the employer to claim the maximum tip credit, the employer must demonstrate that the employee received at least that amount in actual tips. If the employee received less than the maximum tip credit amount in tips, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips. With the exception of tips contributed to a valid tip pool as described in § 531.54, the tip credit provisions of section 3(m) also require employers to permit employees to retain all tips received by the employee.

■ 19. Amend § 531.60(a) by removing the paragraph designation "(a)" and revising the first and third sentences to read as follows:

### § 531.60   Overtime payments.

When overtime is worked by a tipped employee who is subject to the overtime pay provisions of the Act, the employee's regular rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid. * * * In accordance with section 3(m), a tipped employee's regular rate of pay includes the amount of tip credit taken by the employer per hour (not in excess of the minimum wage required by section 6(a)(1) minus $2.13), the reasonable cost or fair value of any facilities furnished to the employee by the employer, as authorized under section 3(m) and this part 531, and the cash wages including commissions and certain bonuses paid by the employer. * * *

*     *     *     *     *

## PART 553—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO EMPLOYEES OF STATE AND LOCAL GOVERNMENTS

■ 20. The authority citation for part 553 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended (29 U.S.C. 201–219); Pub. L. 99–150, 99 Stat. 787 (29 U.S.C. 203, 207, 211). Pub. L. 106–151, 113 Stat. 1731 (29 U.S.C. 203(y)).

■ 21. Amend § 553.210 by revising paragraph (a), removing paragraph (b), and redesignating paragraph (c) as (b) to read as follows:

### § 553.210   Fire Protection Activities.

(a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee * * * in fire protection activities" refers to "an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who—(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk."

■ 22. In § 553.212, revise paragraph (a) and the last sentence of paragraph (b) to read as follows:

### § 553.212   Twenty percent limitation on nonexempt work.

(a) Employees engaged in law enforcement activities as described in § 553.211 may also engage in some nonexempt work which is not performed as an incident to or in conjunction with their law enforcement activities. The performance of such nonexempt work will not defeat either the section 13(b)(20) or 7(k) exemptions unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period. A person who spends more than

20 percent of his/her working time in nonexempt activities is not considered to be an employee engaged in law enforcement activities for purposes of this part.

(b) * * * In addition, the hours of work in the different capacity need not be counted as hours worked for overtime purposes on the regular job, nor are such hours counted in determining the 20 percent tolerance for nonexempt work for law enforcement personnel discussed in paragraph (a) of this section.

### § 553.215   [Removed and Reserved]

■ 23. Remove and reserve § 553.215.

### §§ 553.221, 553.222, 553.223, 553.226, and 553.231   [Amended]

■ 24. Amend §§ 553.221, 553.222, 553.223, 553.226 and 553.231 to remove and add terms as follows. Remove the words "firefighter" or "firefighters" and add, in their place, the words "employee in fire protection activities" or "employees in fire protection activities," respectively, wherever they appear in the following places:
■ a. Section 553.221(a), (d), and (g);
■ b. Section 553.222(a) and (c);
■ c. Section 553.223(a), (c), and (d);
■ d. Section 553.226(c); and
■ e. Section 553.231(b).

## PART 778—OVERTIME COMPENSATION

■ 25. The authority citation for part 778 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.* Section 778.200 also issued under Pub. L. 106–202, 114 Stat. 308 (29 U.S.C. 207(e) and (h)).

■ 26. Revise § 778.110 to read as follows:

### § 778.110   Hourly rate employee.

(a) *Earnings at hourly rate exclusively.* If the employee is employed solely on the basis of a single hourly rate, the hourly rate is the "regular rate." For overtime hours of work the employee must be paid, in addition to the straight time hourly earnings, a sum determined by multiplying one-half the hourly rate by the number of hours worked in excess of 40 in the week. Thus a $12 hourly rate will bring, for an employee who works 46 hours, a total weekly wage of $588 (46 hours at $12 plus 6 at $6). In other words, the employee is entitled to be paid an amount equal to $12 an hour for 40 hours and $18 an hour for the 6 hours of overtime, or a total of $588.

(b) *Hourly rate and bonus.* If the employee receives, in addition to the earnings computed at the $12 hourly rate, a production bonus of $46 for the week, the regular hourly rate of pay is $13 an hour (46 hours at $12 yields $552; the addition of the $46 bonus makes a total of $598; this total divided by 46 hours yields a regular rate of $13). The employee is then entitled to be paid a total wage of $637 for 46 hours (46 hours at $13 plus 6 hours at $6.50, or 40 hours at $13 plus 6 hours at $19.50).

■ 27. Revise § 778.111 to read as follows:

### § 778.111   Pieceworker.

(a) *Piece rates and supplements generally.* When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week. (For an alternative method of complying with the overtime requirements of the Act as far as pieceworkers are concerned, *see* § 778.418.) Only additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked. Thus, for example, if the employee has worked 50 hours and has earned $491 at piece rates for 46 hours of productive work and in addition has been compensated at $8.00 an hour for 4 hours of waiting time, the total compensation, $523.00, must be divided by the total hours of work, 50, to arrive at the regular hourly rate of pay—$10.46. For the 10 hours of overtime the employee is entitled to additional compensation of $52.30 (10 hours at $5.23). For the week's work the employee is thus entitled to a total of $575.30 (which is equivalent to 40 hours at $10.46 plus 10 overtime hours at $15.69).

(b) *Piece rates with minimum hourly guarantee.* In some cases an employee is hired on a piece-rate basis coupled with a minimum hourly guaranty. Where the total piece-rate earnings for the workweek fall short of the amount that would be earned for the total hours of work at the guaranteed rate, the employee is paid the difference. In such weeks the employee is in fact paid at an hourly rate and the minimum hourly guaranty is the regular rate in that week. In the example just given, if the employee was guaranteed $11 an hour for productive working time, the employee would be paid $506 (46 hours at $11) for the 46 hours of productive work (instead of the $491 earned at piece rates). In a week in which no waiting time was involved, the employee would be owed an additional $5.50 (half time) for each of the 6 overtime hours worked, to bring the total compensation up to $539 (46 hours at $11 plus 6 hours at $5.50 or 40 hours at $11 plus 6 hours at $16.50). If the employee is paid at a different rate for waiting time, the regular rate is the weighted average of the 2 hourly rates, as discussed in § 778.115.

■ 28. Amend § 778.113 by revising paragraph (a) and the fifth sentence of paragraph (b) to read as follows:

### § 778.113   Salaried employees—general.

(a) *Weekly salary.* If the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate. If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350 divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter. If an employee is hired at a salary of $375 for a 40-hour week the regular rate is $9.38 an hour.

(b) * * * The regular rate of an employee who is paid a regular monthly salary of $1,560, or a regular semimonthly salary of $780 for 40 hours a week, is thus found to be $9 per hour.
* * *

*     *     *     *     *

■ 29. Amend § 778.114 by revising paragraph (b) to read as follows:

### § 778.114   Fixed salary for fluctuating hours.

*     *     *     *     *

(b) The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose total weekly hours of work never exceed 50 hours in a workweek, and whose salary of $600 a week is paid with the understanding that it constitutes the employee's compensation, except for overtime

premiums, for whatever hours are worked in the workweek. If during the course of 4 weeks this employee works 40, 37.5, 50, and 48 hours, the regular hourly rate of pay in each of these weeks is $15.00, $16.00, $12.00, and $12.50, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due. For the first week the employee is entitled to be paid $600; for the second week $600.00; for the third week $660 ($600 plus 10 hours at $6.00 or 40 hours at $12.00 plus 10 hours at $18.00); for the fourth week $650 ($600 plus 8 hours at $6.25, or 40 hours at $12.50 plus 8 hours at $18.75).

\*   \*   \*   \*   \*

■ 30. Amend § 778.200 by adding paragraph (a) (8) and revising paragraph (b) to read as follows:

### § 778.200   Provisions governing inclusion, exclusion, and crediting of particular payments.

(a) \* \* \*

(8) Any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program which is not otherwise excludable under any of paragraphs (a)(1) through (a)(7) of this section if—

(i) Grants are made pursuant to a program, the terms and conditions of which are communicated to participating employees either at the beginning of the employee's participation in the program or at the time of the grant;

(ii) In the case of stock options and stock appreciation rights, the grant or right cannot be exercisable for a period of at least 6 months after the time of grant (except that grants or rights may become exercisable because of an employee's death, disability, retirement, or a change in corporate ownership, or other circumstances permitted by regulation), and the exercise price is at least 85 percent of the fair market value of the stock at the time of grant;

(iii) Exercise of any grant or right is voluntary; and

(iv) Any determinations regarding the award of, and the amount of, employer-provided grants or rights that are based on performance are—

(A) Made based upon meeting previously established performance criteria (which may include hours of work, efficiency, or productivity) of any business unit consisting of at least 10 employees or of a facility, except that, any determinations may be based on length of service or minimum schedule of hours or days of work; or

(B) Made based upon the past performance (which may include any criteria) of one or more employees in a given period so long as the determination is in the sole discretion of the employer and not pursuant to any prior contract.

(b) *Section 7(h).* This subsection of the Act provides as follows:

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section.

\*   \*   \*   \*   \*

■ 31. Amend § 778.208 by revising the first sentence to read as follows:

### § 778.208   Inclusion and exclusion of bonuses in computing the "regular rate."

Section 7(e) of the Act requires the inclusion in the regular rate of all remuneration for employment except eight specified types of payments. \* \* \*

## PART 779—THE FAIR LABOR STANDARDS ACT AS APPLIED TO RETAILERS OF GOODS OR SERVICES

■ 32. The authority citation for part 779 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; Sec. 29(B), Pub. L. 93–259, 88 Stat. 55; 29 U.S.C. 201–219.

■ 33. Revise the undesignated center heading for §§ 779.371 and 779.372 to read as follows:

Automobile, Truck and Farm Implement Sales and Services, and Trailer, Boat and Aircraft Sales

■ 34. Amend § 779.371 by revising the fifth sentence of paragraph (a) to read as follows:

### § 779.371   Some automobile, truck, and farm implement establishments may qualify for exemption under section 13(a)(2).

(a) \* \* \* Section 13(b)(10) is applicable not only to automobile, truck, and farm implement dealers but also to dealers in trailers, boats, and aircraft. \* \* \*

\*   \*   \*   \*   \*

■ 35. Amend § 779.372 by revising paragraphs (a), (b)(1)(ii), (b)(2), and (c) to read as follows:

### § 779.372   Nonmanufacturing establishments with certain exempt employees under section 13(b)(10).

(a) *General.* A specific exemption from only the overtime pay provisions of section 7 of the Act is provided in section 13(b)(10) for certain employees of nonmanufacturing establishments engaged in the business of selling automobiles, trucks, farm implements, trailers, boats, or aircraft. Section 13(b)(10)(A) states that the provisions of section 7 shall not apply with respect to "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers." Section 13(b)(10)(B) states that the provisions of section 7 shall not apply with respect to "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers." This exemption will apply irrespective of the annual dollar volume of sales of the establishment or of the enterprise of which it is a part.

(b) \* \* \*

(1) \* \* \*

(ii) The establishment must be primarily engaged in the business of selling automobiles, trucks, or farm implements to the ultimate purchaser for section 13(b)(10)(A) to apply. If these tests are met by an establishment the exemption will be available for salesmen, partsmen and mechanics, employed by the establishment, who are primarily engaged during the work week in the selling or servicing of the named items. Likewise, the establishment must be primarily engaged in the business of selling trailers, boats, or aircraft to the ultimate purchaser for the section 13(b)(10)(B) exemption to be available for salesmen employed by the establishment who are primarily engaged during the work week in selling these named items. An explanation of the term "employed by" is contained in §§ 779.307 through 779.311. The exemption is intended to apply to employment by such an establishment of the specified categories of employees even if they work in physically separate buildings or areas, or even if, though working in the principal building of the dealership, their work relates to the work of physically separate buildings or areas, so long as they are employed in a department which is functionally operated as part of the dealership.

(2) This exemption, unlike the former exemption in section 13(a)(19) of the Act prior to the 1966 amendments, is not limited to dealerships that qualify as retail or service establishments nor is it limited to establishments selling automobiles, trucks, and farm implements, but also includes dealers in trailers, boats, and aircraft.

(c) *Salesman, partsman, or mechanic.* (1) As used in section 13(b)(10)(A), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the automobiles, trucks, or farm implements that the establishment is primarily engaged in selling. As used in section 13(b)(10)(B), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of trailers, boats, or aircraft that the establishment is primarily engaged in selling. Work performed incidental to and in conjunction with the employee's own sales or solicitations, including incidental deliveries and collections, is regarded as within the exemption.

(2) As used in section 13(b)(10)(A), a partsman is any employee employed for the purpose of and primarily engaged in requisitioning, stocking, and dispensing parts.

(3) As used in section 13(b)(10)(A), a mechanic is any employee primarily engaged in doing mechanical work (such as get ready mechanics, automotive, truck, or farm implement mechanics, used car reconditioning mechanics, and wrecker mechanics) in the servicing of an automobile, truck or farm implement for its use and operation as such. This includes mechanical work required for safe operation, as an automobile, truck, or farm implement. The term does not include employees primarily performing such nonmechanical work as washing, cleaning, painting, polishing, tire changing, installing seat covers, dispatching, lubricating, or other nonmechanical work. Wrecker mechanic means a service department mechanic who goes out on a tow or wrecking truck to perform mechanical servicing or repairing of a customer's vehicle away from the shop, or to bring the vehicle back to the shop for repair service. A tow or wrecker truck driver or helper who primarily performs nonmechanical repair work is not exempt.

\*      \*      \*      \*      \*

## PART 780—EXEMPTIONS APPLICABLE TO AGRICULTURE, PROCESSING OF AGRICULTURAL COMMODITIES, AND RELATED SUBJECTS UNDER THE FAIR LABOR STANDARDS ACT

■ 36. The authority citation for part 780 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; 29 U.S.C. 201–219. Pub. L. 105–78, 111 Stat. 1467.

■ 37. Revise § 780.400 to read as follows:

### § 780.400   Statutory provisions.

Section 13(b)(12) of the Fair Labor Standards Act exempts from the overtime provisions of section 7 any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year.

■ 38. Amend § 780.401 by revising the first sentence of paragraph (a) and paragraph (b) to read as follows:

### § 780.401   General explanatory statement.

(a) Section 13(b)(12) of the Act contains the same wording exempting any employee employed in agriculture as did section 13(a)(6) prior to the 1966 amendments. \*  \*  \*

(b) In addition to exempting employees engaged in agriculture, section 13(b)(12) also exempts from the overtime provisions of the Act employees employed in specified irrigation activities. The effect of the 1997 amendment to section 13(b)(12) is to expand the overtime exemption for any employee employed in specified irrigation activities used for supply and storing of water for agricultural purposes by substituting "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year" for the prior requirement that all the water be used for agricultural purposes. Prior to the 1966 amendments employees employed in specified irrigation activities were exempt from the minimum wage and overtime pay requirements of the Act.

\*      \*      \*      \*      \*

■ 39. Revise § 780.406 to read as follows:

### § 780.406   Exemption is from overtime only.

This exemption applies only to the overtime provisions of the Act and does not affect the minimum wage, child labor, recordkeeping, and other requirements of the Act.

■ 40. Revise § 780.408 to read as follows:

### § 780.408   Facilities of system at least 90 percent of which was used for agricultural purposes.

Section 13(b)(12) requires for exemption of irrigation work that the ditches, canals, reservoirs, or waterways in connection with which the employee's work is done be "used exclusively for supply and storing of water at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." If a water supplier supplies water of which more than 10 percent is used for purposes other than "agricultural purposes" during the preceding calendar year, the exemption would not apply. For example, the exemption would not apply where more than 10 percent of the water supplier's water is delivered to a municipality to be used for general, domestic, and commercial purposes. Water used for watering livestock raised by a farmer is "for agricultural purposes."

## PART 785—HOURS WORKED

■ 41. The authority citation for part 785 is revised to read as follows:

**Authority:** 52 Stat. 1060; 29 U.S.C. 201–219; 29 U.S.C. 254. Pub. L. 104–188, 100 Stat. 1755.

■ 42. Amend § 785.7 by revising the first sentence to read as follows:

### § 785.7   Judicial construction.

The United States Supreme Court originally stated that employees subject to the act must be paid for all time spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." \* \* \*

■ 43. Amend § 785.9 by adding a sentence after the third sentence in paragraph (a) to read as follows:

### § 785.9   Statutory exemptions.

(a) \* \* \* The use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered "principal" activities when meeting the following conditions: The use of the employer's vehicle for travel is within the normal commuting area for

the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

■ 44. Amend § 785.34 by adding a sentence after the first sentence to read as follows:

### § 785.34   Effect of section 4 of the Portal-to-Portal Act.

* * * Section 4(a) further provides that the use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered principal activities when the use of such vehicle is within the normal commuting area for the employer's business or establishment and is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

■ 45. Amend § 785.50 by adding a sentence at the end of paragraph (a)(2) to read as follows:

### § 785.50   Section 4 of the Portal-to-Portal Act.

*       *       *       *       *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*       *       *       *       *

## PART 786—MISCELLANEOUS EXEMPTIONS AND EXCLUSIONS FROM COVERAGE

■ 46. The authority citation for part 786 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201–219. Pub. L. 104–188, 100 Stat. 1755. Pub. L. 105–221, 112 Stat. 1248, 29 U.S.C. 203(e).

■ 47. Revise the heading to part 786 to read as set forth above.

■ 48. Add subpart G consisting of § 786.300 to read as follows:

### Subpart G—Youth Opportunity Wage

#### § 786.300   Application of the youth opportunity wage.

Section 6(g) of the Fair Labor Standards Act allows any employer to pay any employee who has not attained the age of 20 years a wage of not less than $4.25 an hour during the first 90 consecutive calendar days after such employee is initially employed by such employer. For the purposes of hiring workers at this wage, no employer may take any action to displace employees, including partial displacements such as reducing hours, wages, or employment benefits. Any employer that violates these provisions is considered to have violated section 15(a)(3) of the Act.

■ 49. Add subpart H consisting of § 786.350 to read as follows:

### Subpart H—Volunteers at Private Non-Profit Food Banks

#### § 786.350   Exclusion from definition of "employee" of volunteers at private non-profit food banks.

Section 3(e)(5) of the Fair Labor Standards Act excludes from the definition of the term "employee" individuals who volunteer their services solely for humanitarian purposes at private non-profit food banks and who receive groceries from the food banks.

## PART 790—GENERAL STATEMENT AS TO THE EFFECT OF THE PORTAL-TO-PORTAL ACT OF 1947 ON THE FAIR LABOR STANDARDS ACT OF 1938

■ 50. The authority citation for part 790 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 110 Stat. 1755; 29 U.S.C. 201–219; 29 U.S.C. 254.

■ 51. Amend § 790.3 by adding a sentence at the end of paragraph (a)(2) to read as follows:

### § 790.3   Provisions of the statute.

*       *       *       *       *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*       *       *       *       *

[FR Doc. 2011–6749 Filed 4–4–11; 8:45 am]

BILLING CODE 4510-27-P